204 P.3d 217 (2009)
STATE of Washington, Respondent,
v.
Vasquez Jose DEPAZ, Petitioner.
No. 80574-1.
Supreme Court of Washington, En Banc.
Argued September 16, 2008.
Decided April 2, 2009.
*218 Eric Broman, Nielsen Broman & Koch PLLC, Seattle, WA, for Petitioner.
King County Prosecutor's Office, Andrea Ruth Vitalich, Seattle, WA, for Respondent.
OWENS, J.
¶ 1 Vasquez Depaz challenges his conviction for child rape on the grounds that the trial court abused its discretion when it dismissed a known holdout juror. Depaz urges this court to extend its decision in State v. Elmore, 155 Wash.2d 758, 123 P.3d 72 (2005), to limit the trial court's discretion under RCW 2.36.110 in deciding whether to remove a holdout juror. We reject Depaz's request to extend Elmore because the concerns present in a case involving juror nullification are not present in a case involving the removal of a juror for communicating with a third party. We also decline the State's invitation to establish an automatic dismissal rule without a showing of prejudice under RCW 2.36.110. However, we hold that the trial court abused its discretion in deciding to excuse the holdout juror under RCW 2.36.110.

FACTS
¶ 2 The State charged Depaz with four counts of first degree rape of a child. The charges generally related to an alleged sexual relationship between Depaz and an 11-year-old girl.
¶ 3 After a trial, the court submitted the case to the jury for deliberation on Thursday, July 14, 2005. Just before lunch the following day, the presiding juror informed the court that the jury had reached deadlock on all four counts and that several jurors would not change their positions. The court instructed the jury to continue its deliberations.
¶ 4 After a lunch recess, the presiding juror sent another message to the court regarding potential misconduct by juror 3. Over objection by the defense, the court questioned the presiding juror, the juror who overheard the conversation (juror 14), and the juror who made the phone call (juror 3).
¶ 5 During questioning by the court, juror 14 explained that juror 3 said she needed to make a call because her grandchild was having *219 surgery that day. Juror 14 overheard juror 3 talk about the surgery and then "she said, well, we're at lunch; the Judge says we have to keep deliberating; all the evidence is circumstantial; the badgering has started; and I will." Verbatim Report of Proceedings (VRP) (July 15, 2005) at 16. Juror 14 reported this conversation to the other jurors and stated that juror 3 agreed in essence with juror 14's account of the conversation.
¶ 6 Next, the court questioned juror 3, who explained the nature of the telephone call to her husband:
I asked him about a grandson who's undergoing some very serious surgery today, how that was going, and then hebecause I had indicated earlier in the day that I didn't know whether we would be through today or not, I had also indicated to him earlier in the day that I thought I was in the minority in my opinion, and let it go at that, and so he asked me that question how things were going and did Iand would I argue persuasively to convince others of my view, and that's kind of where it was.
Id. at 21-22. Juror 3's response invoked the following exchange:
THE COURT: Okay. During the conversation, did you tell him that, in your opinion, the case rested on circumstantial evidence?
JUROR 3: I may have used that word. The other person thought I did so I may have used that word.
THE COURT: Why did you tell him about that?
JUROR 3: Because we were at a point where it was 11 to 1 and I was beginning to feel that I was being badgered by the others.
THE COURT: But what does that have to do with circumstantial evidence or not?
JUROR 3: Probably nothing.
THE COURT: Did you have any substantive discussion about the case at all? In other words, did he know what type of case it was?
JUROR 3: No.
....
THE COURT: Did you tell him about being in the minority?
JUROR 3: I did that this morning. When I was leaving the house, he asked me, well, when are you going to be back. We're both very worried about the grandson.
Id. at 22-23.
¶ 7 The State then further questioned juror 3 about the conversation:
MR. HUNG: ... There's been some testimony that in response to something that your husband said to you, you said, I will. Do you remember that part of the conversation at all?
JUROR 3: It was, well, let me know when you're through, and I will. I believe that's the way it ended.
MR. HUNG: Oh, I see. So, at any point, did your husband try and support you in maintaining your position as the minority or anything like that? Did he say anything or offer any advice?
....
JUROR 3: No. Nothing other than saying, well, if you feel strongly in that way, you know, in your view, if you feel strongly in that, stick to your guns.
Id. at 24.
¶ 8 Denying the State's motion to discharge juror 3, the trial court concluded that juror 3 did not engage in the type of misconduct that would disqualify her from further serving on the jury and that the disclosure of her conversation did not taint the other jurors to require a mistrial. The court "conclude[d] that [her conversation] does not rise to the level of misconduct based on the information provided by the three jurors that we interviewed that would require disqualification of Juror 3 at this time based on the information that we have." Id. at 30. The court instructed the jury to continue its deliberations.
¶ 9 Later that day, the jury sent another note to the court, indicating that "[n]one of us has changed our opinion since this morning (enough to get any closer to a verdict)." Clerk's Papers at 42. The note went on to explain that several jurors had medical and other commitments for the following week. After reading the note, the court called the *220 jury out and asked the presiding juror if there was any reasonable probability of the jury reaching a unanimous verdict within a reasonable time. The presiding juror answered "No." VRP (July 15, 2005) at 38.
¶ 10 Despite a recognition that "there's nothing different now than there was an hour ago in terms of why I would excuse her," the court reconsidered the State's motion to excuse juror 3. Id. at 42. While the court expressed concern that juror 3 did not give an adequate explanation as to why she had commented to her husband about the circumstantial evidence of the case, it again determined that there was no clear showing of misconduct: "And it's just that if the misconduct jumped out and I could say this is clear misconduct, and it has nothing to do with this being a hold-out juror, then I would do it." Id. at 39. Furthermore, the court determined that even if juror 3's statements about the case constituted misconduct, any such statement would not show that she had been prejudiced herself.
¶ 11 The court went on to consider the statement made by the husband and determined that the fact he told her to stick to her guns would not have affected juror 3's opinion of the case. The court explained, "[H]e didn't give her an opinion, he was basically saying if that's what you believe, stick with what you believe, which is a form of moral support. He's not telling her ... don't change your mind." Id. at 43. Rejecting the State's argument that the husband's statement essentially told juror 3 that her opinion of the case was correct, the court indicated that the State was "inferring a little bit more into that conversation than she told us. I mean, that may be the inference, but he's basically saying stick with it." Id. at 49. "The conversation d[idn]'t change anything" because the court knew the jury was hung before the conversation. Id. at 47.
¶ 12 The court expressed concern over the fact that it knew juror 3 was the holdout juror. Indeed, the court conceded that "if she hadn't told us that she was a holdout juror, I just don't see where theI mean, I don't think that we would have concluded that there was prejudice to either side based on this conversation." Id. at 46. Knowing juror 3 was the holdout, the court recognized the implication of the decision it faced: "[I]f I don't excuse Number 3, I'm persuaded we're going to have a mistrial anyway, we're going to have a mistrial on Monday. So that's the decision." Id. at 49.
¶ 13 Despite having failed to determine any reasons why juror 3 should be excused, the court left open the possibility that it still might excuse juror 3. The court decided that it would hold the jury over the weekend and then it would determine if the alternate jurors were available to replace juror 6 and possibly juror 3. The court recognized that the availability of the second alternate "should influence things but it may effectit may result in a mistrial if I do decide we need to replace [juror] 3 and [the second alternate] is not available." Id. at 54.
¶ 14 On Monday morning, the court conducted a short voir dire of the alternate jurors. The court explained that "[a]fter my voir dire of each juror, I will render a decision with respect to replacing juror 3." VRP (July 18, 2005) at 2. The court determined both alternates to be qualified and replaced juror 6 with the first alternate.
¶ 15 Next, the court revealed that it had also decided to excuse juror 3 after reconsidering the testimony and conducting its own legal research. The court first expressed that it had reservations about juror 3's candor with the court. Specifically, the court recalled that she did not volunteer to the court that she made a statement to her husband regarding the circumstantial evidence, and that she only admitted such a statement after the court inquired about it. Furthermore, the court accused juror 3 of denying that she had any discussion about the case beyond the comment about circumstantial evidence.
¶ 16 In addition, the court determined that juror 3 had failed to follow the jury instructions and to avoid outside influences during deliberations. The court found that "[h]er husband told her to stick to her guns, and she made a commitment to him that she would." Id. at 13. The court concluded, "Clearly, this juror is being influenced by a third party, her husband, and the good *221 grounds have been shown for her excusal." Id. at 14.
¶ 17 In explaining its change of opinion, the court claimed that it evaluated juror 3's conduct independent of the fact that she was the holdout juror and concluded that it supported grounds for excusing her. The court replaced juror 3 and instructed the jury to begin its deliberations over. Later that day, the reconstituted jury found Depaz guilty of count one. After the verdict, Depaz filed a motion for new trial based on the dismissal of juror 3 that the court subsequently denied.
¶ 18 The Court of Appeals affirmed Depaz's conviction. State v. Depaz, noted at 139 Wash.App. 1038, 2007 WL 1885081. Recognizing that the trial court had a duty under RCW 2.36.110 to excuse a juror who has committed misconduct, the court determined that a juror's communication with a third party constitutes misconduct and gives rise to a presumption of prejudice. Id. at *4. Finally, the court concluded that the trial court did not abuse its discretion in dismissing juror 3. Id. We granted Depaz's petition for review of the Court of Appeals decision. State v. Depaz, 163 Wash.2d 1032, 187 P.3d 268 (2008).

ISSUES
¶ 19 We granted review to consider two related issues. We must decide whether to extend the evidentiary standard established in Elmore, 155 Wash.2d 758, 123 P.3d 72, to govern situations involving the dismissal of a putative holdout juror for misconduct. If not, we must decide what standard to apply when considering such a dismissal. Finally, we must decide whether the trial court abused its discretion in dismissing the holdout juror under RCW 2.36.110.

ANALYSIS

A. Standard of Review

¶ 20 This court reviews the trial court's determination of whether to dismiss a juror for abuse of discretion. Elmore, 155 Wash.2d at 778, 123 P.3d 72. A trial court abuses its discretion when it bases its decision on untenable grounds or reasons. State v. Powell, 126 Wash.2d 244, 258, 893 P.2d 615 (1995).

B. Applicable Standard when Considering Dismissal of a Holdout Juror

¶ 21 In order to resolve this dispute, we first must decide which standard a trial court is to apply when evaluating dismissal of a holdout juror for misconduct. A trial court has the duty to excuse a juror who is unfit for jury service. RCW 2.36.110. That statute provides the grounds for which the court may dismiss a juror:
It shall be the duty of a judge to excuse from further jury service any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service.
Id. Court rules establish the procedures for replacing a juror who has been excused during jury deliberations. See CrR 6.5. Despite the clear language of the statute, Depaz urges this court to adopt a more stringent evidentiary standard that trial courts must apply in determining whether to excuse a holdout juror.

1. Reasonable Possibility Standard under Elmore

¶ 22 Depaz argues that discretion to dismiss a juror under RCW 2.36.110 is limited in cases involving the removal of a holdout juror in order to protect a defendant's constitutional rights of due process and to a unanimous verdict by a fair and impartial jury. Our state constitution protects a criminal defendant's right to due process and a unanimous jury verdict. Const. art. I, §§ 3, 21, 22; see State v. Ortega-Martinez, 124 Wash.2d 702, 707, 881 P.2d 231 (1994). This court has recognized that the dismissal of a juror "stemming from [the] juror's doubts about the sufficiency of the evidence would violate the right to a unanimous jury verdict." Elmore, 155 Wash.2d at 771, 123 P.3d 72 (citing Sanders v. Lamarque, 357 F.3d 943, 945 (9th Cir.2004)). Furthermore, the dismissal of a holdout juror risks violating the right to an impartial jury because it may *222 appear that the trial court is reconstituting the jury in order to reach a certain result. Id. at 772, 123 P.3d 72. Depaz claims that because juror 3 was the holdout juror, her removal raises the same constitutional rights.
¶ 23 Depaz relies on Elmore, in which this court held that "where a deliberating juror is accused of refusing to follow the law, that juror cannot be dismissed when there is any reasonable possibility that his or her views stem from an evaluation of the sufficiency of the evidence." Id. at 778, 123 P.3d 72. In establishing this standard, this court recognized that cases where a juror is accused of nullification,[1] refusing to deliberate, or refusing to follow the law involve special considerations that require greater limitations on the trial court's discretion beyond simply applying RCW 2.36.110. Id. at 769-70, 123 P.3d 72.
¶ 24 The court explained that claims of nullification require the court to focus on the jury's deliberations and a juror's views of the case. Id. at 770-71, 123 P.3d 72. For example, jury members who accuse another juror of nullification or refusal to follow the law may simply be frustrated that the juror does not agree with their assessment of the evidence. The trial court could evaluate the substance of such an accusation only after inquiring into the accused juror's actual views of the case. On one hand, the court would have to inquire about the juror's views of the case before it could excuse the accused juror because, as noted above, a trial court must be sure not to remove a juror based on that juror's views of the sufficiency of the evidence. Id. at 771, 123 P.3d 72. On the other hand, such an inquiry would violate the principle protecting the secrecy of jury deliberations. Id. at 770, 123 P.3d 72.
¶ 25 These two considerations conflict because the court cannot excuse a juror without knowing whether the accusation actually stems from the accused juror's views on the evidence. However, the court also cannot determine whether or not the juror's views stem from his or her views on the evidence without disrupting the secrecy of jury deliberations.
¶ 26 This court established the "reasonable possibility" standard in order to resolve these competing interests. This standard removes the court's focus from the accused juror's views of the evidence by creating a standard that merely requires a determination on the possibility that the accusation stems from the juror's views on the evidence. While the "reasonable possibility" standard does not require the trial court to actually determine the merit of the accusation, it errs on the side of caution by protecting the defendant's constitutional right to ensure that a juror is not dismissed for his or her views of the evidence. Id. at 777-78, 123 P.3d 72.
¶ 27 This case does not involve the same special considerations involved in Elmore to warrant extension of the "reasonable possibility" standard. Juror 3 was accused of communicating with a third party. Therefore, the trial court's investigation of the alleged misconduct did not necessarily require the court to focus on the jury deliberation itself. See id. at 770, 123 P.3d 72 ("[A]ccusations that a deliberating juror has discussed or considered extrinsic evidence... can be investigated without direct discussion of the juror's views about the merits of the case." (citations omitted)). While some of juror 3's statements involved information about the deliberation process, the trial court did not have to evaluate her views of the case in order to determine whether she communicated with a third party or received extrinsic information about the case. A defendant has a constitutional right to ensure a unanimous jury, but that right does not extend to protect against the dismissal of a juror who violates the court's instructions by communicating information about the jury's deliberations to third parties.
¶ 28 This court expressly reserved the "reasonable possibility" standard for cases involving accusations of nullification and refusing to deliberate or follow the law. See id. at 774, 123 P.3d 72 ("We emphasize that the trial court retains discretion to investigate *223 accusations of juror misconduct in the manner most appropriate for a particular case."). This heightened standard protects the secrecy of jury deliberations and the constitutional rights of the defendant. As this case does not involve accusations that would necessarily require investigation into the jury's deliberations,[2] we reject Depaz's argument in favor of applying the "reasonable possibility" standard and review the trial court's decision under RCW 2.36.110. Thus, under RCW 2.36.110, we must decide whether a discernible standard constrains a trial court's discretion on the question of whether to dismiss a holdout juror for misconduct.

2. Requiring a Showing of Prejudice under RCW 2.36.110
¶ 29 According to the State, RCW 2.36.110 permits the trial court to remove a juror simply for engaging in misconduct. See State v. Jorden, 103 Wash.App. 221, 229, 11 P.3d 866 (2000). The State asserts that juror 3 committed misconduct by failing to follow the court's instructions not to discuss the case with a third party. The Court of Appeals agreed and affirmed the trial court, concluding that the court properly dismissed juror 3 for discussing the case with her husband. We disagree with this approach.
¶ 30 While a finding of misconduct relates to "conduct or practices incompatible with proper and efficient jury service," it does not fully reflect that a juror has manifested unfitness to serve on the jury as required under RCW 2.36.110. Indeed, as the trial court acknowledged, a juror's statements about the case to a third party does not manifest an inability to deliberate or consider the evidence impartially.[3] Therefore, the court looked to the statements made to juror 3 to evaluate whether her ability to deliberate had been compromised by the communication.
¶ 31 Cases reviewing findings of juror misconduct raised in motions for a new trial have required a showing of prejudice against a party in order to support an order for a new trial. See, e.g., State v. Bourgeois, 133 Wash.2d 389, 406, 945 P.2d 1120 (1997); State v. Theobald, 78 Wash.2d 184, 186, 470 P.2d 188 (1970); McBroom v. Orner, 64 Wash.2d 887, 888, 395 P.2d 95 (1964); State v. Barnes, 85 Wash.App. 638, 669, 932 P.2d 669 (1997) ("Not all instances of juror misconduct merit a new trial; there must be prejudice."). While prejudice may be presumed upon a showing of misconduct, that presumption can be overcome by an adequate showing that the misconduct did not affect the deliberations. See State v. Murphy, 44 Wash.App. 290, 296, 721 P.2d 30 (1986) ("[T]his presumption is not conclusive and may be overcome if the trial court determines such misconduct was harmless to the defendant."); Barnes, 85 Wash.App. at 669, 932 P.2d 669 ("We determine prejudice by asking whether the withheld or extraneous information could have affected the jury's deliberations."); State v. Tigano, 63 Wash. App. 336, 341, 818 P.2d 1369 (1991).
¶ 32 The trial court cannot be required to determine prejudice in all cases for which it must decide whether to excuse a juror under RCW 2.36.110. In some cases, the court may have to decide whether to excuse a juror before it is known how the misconduct may affect the jury's deliberations, such as where a juror is accused of sleeping during the trial. See Jorden, 103 Wash.App. 221, 11 P.3d 866. In such cases, the juror's conduct can manifest an inability to serve even before deliberations have begun, and a court does not substantially prejudice deliberations by dismissing the juror.
*224 ¶ 33 On the other hand, RCW 2.36.110 offers little guidance for a trial court faced with a dismissal decision that will have a direct and foreseeable effect on the outcome of the case. In such a case, prejudice necessarily becomes an important consideration in the court's determination whether to excuse a juror for misconduct. In this case, juror 3 informed the court that she was the holdout juror. The court clearly understood the implications of its decision on whether to excuse juror 3 based on its knowledge that she was the holdoutthat there would be a mistrial if he did not dismiss her. VRP (July 15, 2005) at 49.
¶ 34 Misconduct alone cannot determine the removal of a juror under such circumstances because the court cannot avoid considering the effect of the removal on the jury's deliberations. In addition, prejudice cannot be presumed under such circumstances because prejudice cuts both ways. If the court presumed that a juror's misconduct caused prejudice to the State, such a presumption would fail to acknowledge the prejudicial effect that removal of a holdout juror would have on the defendant.
¶ 35 Thus, where the trial court has knowledge of a deliberating juror's substantive opinion of the case, trial courts must make a determination regarding prejudice. Prejudice should be determined by concluding whether any misconduct committed by the juror has affected the juror's ability to deliberate before deciding to excuse the juror under RCW 2.36.110. If the court decides that the juror can still deliberate fairly despite the misconduct, the court should not excuse the juror. Only if the misconduct reasonably would have altered the juror's formulated opinion of the case can the court disturb the deliberations that led the juror to reach such a decision.
¶ 36 Requiring a trial court to determine prejudice before it removes a holdout juror protects the defendant's right to a unanimous jury by assuring that the desire for a particular outcome has not influenced the court's decision to remove a juror. See Elmore, 155 Wash.2d at 771, 123 P.3d 72 (recognizing that a trial judge might be tempted to influence the jury's verdict if it inquires into ongoing jury deliberations). The removal of a juror upon a showing of bare misconduct fails to demonstrate a purpose for the removal. Juror 3's own statements to her husband may have constituted misconduct because she failed to follow the court's instructions, but such misconduct would not necessarily indicate that she had been improperly influenced or unable to continue to deliberate. Thus, a showing of prejudice prevents a trial court from removing a holdout juror on a technical finding of misconduct without further determining the removal serves a purpose of avoiding prejudice to one of the parties.

C. Abuse of Discretion

¶ 37 We must now decide whether the trial court abused its discretion when it dismissed juror 3 pursuant to RCW 2.36.110. Notwithstanding Elmore, the standard of review for juror removal during deliberation is abuse of discretion. State v. Ashcraft, 71 Wash.App. 444, 461, 859 P.2d 60 (1993). "A court abuses its discretion when an `order is manifestly unreasonable or based on untenable grounds.'" State v. Quismundo, 164 Wash.2d 499, 504, 192 P.3d 342 (2008) (quoting Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wash.2d 299, 339, 858 P.2d 1054 (1993)). "A discretionary decision `is based "on untenable grounds" or made "for untenable reasons" if it rests on facts unsupported in the record.'" Id. (quoting State v. Rohrich, 149 Wash.2d 647, 654, 71 P.3d 638 (2003) (quoting State v. Rundquist, 79 Wash.App. 786, 793, 905 P.2d 922 (1995))).
¶ 38 In this case, the trial record supports a facial showing of misconduct. While a juror can communicate with others so long as they do not discuss the nature of the case, see State v. Kell, 101 Wash.App. 619, 622, 5 P.3d 47 (2000), a juror's communication with a third party about the case constitutes misconduct, see State v. Brenner, 53 Wash.App. 367, 372, 768 P.2d 509 (1989), overruled on other grounds by State v. Wentz, 149 Wash.2d 342, 68 P.3d 282 (2003). The record reflects that juror 3 admitted to having two conversations with her husband regarding the case after deliberations had begun. In one conversation, she admitted *225 that she told her husband her opinion that the case rested on circumstantial evidence. The Court of Appeals determined that such evidence constituted misconduct. We agree. However, the trial court did not reach tenable grounds or reasoning to support a finding that the misconduct caused prejudice by preventing juror 3 from deliberating fairly. When the court finally decided to excuse juror 3 under RCW 2.36.110, it based its decision on two facts as it understood them. First, the court determined that juror 3 had demonstrated a lack of candor with the court about the scope and nature of her conversation. VRP (July 18, 2005) at 13. The court noted that she did not voluntarily disclose that she said the case was based on circumstantial evidence. Furthermore, she denied having any discussion about the case. The court concluded that juror 3's lack of candor with the court made it impossible to know the scope of her conversation with her husband. Id. Second, the court determined that she had not followed the court's instructions by affirming to her husband that she would stick to her guns. Id.
¶ 39 It is unclear from this record how the court reached its conclusion that juror 3 denied discussing the case with her husband. The transcript clearly indicates that she voluntarily admitted to talking to her husband about the case. When asked to describe the nature of the call, juror 3 explained that after talking about her grandchild, she told her husband that she was in the minority opinion in deliberations. VRP (July 15, 2005) at 21-22. When asked if she told him her opinion that the case was based on circumstantial evidence, she did not deny it. Id. at 22. In addition, she voluntarily told the court that she communicated her opinion of the case to her husband. The court failed to explain how such an admission can be characterized as a denial that she discussed the case with her husband. Indeed, the court confusingly asserted that "her own admission is inconsistent with such a denial." VRP (July 18, 2005) at 13. An admission cannot logically support a finding that she denied the same fact.
¶ 40 Further, the fact that she disclosed her opinion on the telephone actually supports the contrary conclusion that she had not previously discussed the case with her husband. At the time she told her husband that the case rested on circumstantial evidence, the jury had been deliberating for an entire day. Therefore, she knew the nature of the evidence for a whole day and would likely have revealed her opinion if she had any alleged prior conversations about the case before the telephone conversation.
¶ 41 Finally, the court failed to explain how juror 3's lack of candor leads to the conclusion that she could no longer serve as an impartial juror or had been improperly influenced by an outside source. The court had previously recognized that any statement made by juror 3 was irrelevant to any determination of whether her judgment in the case had been affected by an outside source. Therefore, whatever she told her husband about the case would not provide any insight as to her ability to decide the case free of outside influence.
¶ 42 Nothing in the record supports the court's conclusion that juror 3 made a commitment to her husband that she would stick to her guns in response to his statement. In response to a direct question from the State, juror 3 stated that she said "I will" in response to her husband asking her to let him know when the trial was over. VRP (July 15, 2005) at 24. Juror 14, who overheard the conversation, admitted that she did not hear the voice on the other end of the telephone. Furthermore, the court made no finding that it questioned juror 3's credibility on that particular statement. Despite an initial determination that the husband's statement was offered more for moral support rather than an opinion on the case, the court ultimately reached the contrary conclusion that "[c]learly, this juror is being influenced by a third party." VRP (July 18, 2005) at 14. However, the court offered no support for this reversal. In sum, the court's reconsidered conclusion rests on an erroneous view of the facts.
¶ 43 The State argues that dismissal was appropriate because the trial court should presume that a juror has been prejudicially influenced when the juror and a third party have engaged in any discussion about the *226 substance of the case. The State cites to Stockton v. Virginia, 852 F.2d 740, 741 (4th Cir.1988), affirming a federal court's reversal of a death sentence because jurors had a prejudicial communication with a third party during a break in deliberations. The jurors told the third party that they were hung, to which the third party responded that they should "`fry the son of a bitch.'" Id. at 742. The court determined that such communication posed a potential for prejudice too serious to ignore. Id. at 745.
¶ 44 The facts of Stockton highlight the relatively innocuous nature of the husband's statement. The comment made in Stockton involved a direct opinion on the ultimate decision the jury had to make. Id. at 746. The third party had injected public opinion into the jury's deliberations and therefore violated the autonomy of its collective decision. See id. There is little doubt that such a comment on the verdict of the case would demonstrate prejudice under any standard. On the contrary, the statement made in this case does not suggest any opinion on the ultimate decision. Instead, it merely advised juror 3 to follow her own opinion, not to suggest the opinion of anyone else. Evident prejudice is lacking here, and the dismissal amounted to an abuse of discretion.

CONCLUSION
¶ 45 Because the unusual facts of this case do not implicate the kinds of concerns we addressed in Elmore, we decline to extend its holding to resolve Depaz's case. Further, we decline a strict per se rule that would allow for dismissal of holdout jurors for misconduct without some showing of prejudice. The dismissal decision remains within the discretion of the trial court as it is in the best position to assess the circumstances at hand. In this case, the trial court abused its discretion by reaching a decision based on untenable reasons because of its erroneous view of the facts present in the record.
¶ 46 We reverse the decision of the Court of Appeals and vacate Depaz's conviction.
WE CONCUR: ALEXANDER, C.J., SANDERS, CHAMBERS and FAIRHURST, JJ.
MADSEN, J. (concurring).
¶ 47 I concur with the result, but not the reasoning of the majority. In my view the trial court in this case should have applied the Elmore standard before excusing juror 3 because the court's reasons for dismissing the juror fall within the Elmore court's limitation of the "reasonable possibility" standard to "the rare case where a juror is accused of engaging in nullification, refusing to deliberate, or refusing to follow the law." State v. Elmore, 155 Wash.2d 758, 778, 123 P.3d 72 (2005).
¶ 48 Before dismissing juror 3, the court explained,
The court has strong reservations about the extent of the candor by Juror Number 3 as to the scope of the discussion about this case with her husband.... Juror Number 3 also was not following jury instruction number two, which is [WPIC 10.4Washington Practice: Washington Pattern Jury Instructions: Criminal], for each juror to decide the case for him or herself, but only after considering the evidence impartially with fellow jurors.... Her husband told her to stick to her guns, and she made a commitment to him that she would.... Clearly, this juror is being influenced by a third party, her husband, and the good grounds have been shown for her excusal.... [T]his juror can no longer serve as an impartial juror, has failed to follow the instructions of the Court and has been improperly influenced by outside sources.
Verbatim Report of Videotape Recorded Proceedings (VRP) (July 18, 2005) at 13-14. Thus, contrary to the majority's assertion, the court did not excuse juror 3 merely because she engaged in misconduct. Rather, the court excused juror 3 because she was refusing to deliberate impartially with other jurors as a result of her alleged commitment to her husband to acquit.
¶ 49 Although the trial court did not explicitly separate this reason from its initial concern of misconduct, it is evident that the court dismissed juror 3 because of his concern with jury nullification rather than for *227 misconduct.[1] Indeed, the court initially ruled that the juror's misconduct (communicating with her husband) was not sufficient to dismiss the juror. VRP (July 15, 2005) at 29-30. In the end, the judge dismissed juror 3 because he believed her commitment to "stick to her guns" made her incapable of deliberating fairly. The judge reached this conclusion after learning that juror 3 was the lone holdout and that there would be a mistrial if he did not dismiss her. Id. at 49. Thus, the court excused juror 3 for engaging in nullification, for refusing to follow the law, and for refusing to deliberate. Because the court excused juror 3 for the reasons identified in Elmore, it should have applied Elmore's heightened evidentiary standard before dismissing juror 3.
¶ 50 The majority bases its refusal to apply Elmore to these facts on the erroneous premise that the court excused juror 3 simply because she engaged in misconduct by communicating with a third party. This premise would be correct if the court had excused the juror as soon as it learned of the misconduct. However, when the presiding juror first reported the misconduct, the court declined to excuse the juror and allowed the juror to continue deliberations. Id. at 29-30.
¶ 51 Soon after the court declined to dismiss juror 3, the jury reported that two jurors had scheduling conflicts that would prevent them from deliberating into the next week. Id. at 32. The State then renewed its motion to dismiss juror 3 and argued that, based on the prosecutor's observations of the juror's previous testimony, juror 3 had shut down and was not capable of deliberating. Id. at 33-34. The court then asked the presiding juror if there was a reasonable probability of reaching a unanimous verdict within a reasonable amount of time. Id. at 38. The presiding juror responded in the negative, and the other jurors concurred. Id.
¶ 52 At that point, the court recognized that nothing had changed since its first ruling and that the State wanted to dismiss juror 3 because she was the lone holdout. Id. at 34, 42. The court saw nothing wrong with the communication between juror 3 and her husband and declined to dismiss her:
[Her husband] didn't give [juror 3] an opinion, he was basically saying if that's what you believe, stick with what you believe, which is a form of moral support. He's not telling her ... don't change your mind. He's saying, if that's what you believe, stick with it.
Id. at 43. Before the judge changed his mind and his ruling on Monday morning, he had gathered no new information, except that both alternate jurors were available and remained impartial. VRP (July 18, 2005) at 2-10.
¶ 53 Examination of the record reveals that the court's main concern with allowing juror 3 to remain on the jury was the possibility of a mistrial. After the State renewed its motion to dismiss juror 3, the judge stated that he would have to declare a mistrial if he did not dismiss juror 3. VRP (July 15, 2005) at 49. The judge went on to say that he would have to determine whether there was an available alternate before he could dismiss juror 3 because there would be a mistrial if he dismissed the juror without someone to replace her. Id. at 54.
¶ 54 Despite the trial court's stated reasons for dismissing juror 3, the majority narrowly focuses on the initial complaint that the juror engaged in third party communication. The majority then distinguishes this case from Elmore because investigation of misconduct based on third party communications does not require an inquiry into the jury's deliberations and does not present the concerns discussed in Elmore. The majority reasons that a court's investigation into allegations of misconduct rarely reveal that the challenged juror is the lone holdout and that this rare instance when misconduct and jury *228 nullification intersect does not justify extending Elmore.
¶ 55 Certainly, many cases where a juror is accused of improper third party communication during deliberations do not present the concerns in Elmore, and such allegations usually do not require the trial court to question the jurors about deliberations. Indeed, the trial court here likely could have avoided knowledge of the juror's holdout status by instructing her not to disclose the status or content of jury deliberations.
¶ 56 However, disclosure by juror 3 that she was the lone holdout unquestionably triggered Elmore's concerns about protecting a defendant's rights to an impartial jury and a unanimous verdict:
Dismissal of a holdout juror also risks violating the Sixth Amendment right to an impartial jury. If it appears that a trial court is reconstituting a jury in order to reach a particular result, then the right to an impartial jury is sacrificed. If a holdout juror is dismissed in a way that implies his dismissal stems from his views on the merits of the case, then the reconstituted jury may be left with the impression that the trial judge prefers a guilty verdict.
Thus, respect for these rights requires that where a trial court concludes that there is a reasonable possibility that the impetus for removal of a deliberating juror is disagreement with the juror's view of the sufficiency of the evidence, the trial court must send the jury back to deliberate with instructions that the jury continue to try to reach a verdict. Otherwise, the defendant is entitled to a mistrial.
Elmore, 155 Wash.2d at 772, 123 P.3d 72 (citations omitted). Because the dismissal of a holdout juror implicates these vital rights, this court should look to the trial court's stated reasons for dismissing a juror to determine whether Elmore applies even when other misconduct may also be present.
¶ 57 Rather than applying Elmore, the majority creates a new standard:
[W]here the trial court has knowledge of a deliberating juror's substantive opinion of the case, trial courts must make a determination regarding prejudice. Prejudice should be determined by concluding whether any misconduct committed by the juror has affected the juror's ability to deliberate before deciding to excuse the juror under RCW 2.36.110. If the court decides that the juror can still deliberate fairly despite the misconduct, the court should not excuse the juror. Only if the misconduct reasonably would have altered the juror's formulated opinion of the case can the court disturb the deliberations that led the juror to reach such a decision.
Majority at 223-24.
¶ 58 The majority's new "prejudice" standard should be rejected for several reasons. First, it overlaps with and contradicts Elmore. It allows the trial court to dismiss a holdout juror for misconduct if the judge determines that the alleged misconduct has affected the juror's ability to deliberate fairly. That is, in order to dismiss a holdout juror for misconduct, the misconduct must have so influenced the juror's opinion of the case as to cause her to refuse to deliberate further, to refuse to consider the evidence, and to refuse to apply the law.[2] Essentially, under the majority's new standard, a holdout juror may be dismissed for misconduct only if the misconduct causes her to engage in nullification.
¶ 59 In contrast, under Elmore, in order for a trial court to dismiss a juror for allegations of engaging in nullification, refusal to follow the law, or refusal to deliberate, the trial court must first determine that there is no reasonable possibility the impetus for dismissal is the juror's views on the sufficiency of the evidence. Only if there is no such reasonable possibility does the court have discretion to dismiss the juror.
¶ 60 The majority's standard allows a trial court to dismiss a juror for engaging in nullification without first determining whether there is a reasonable possibility the true impetus for removal is the juror's views on *229 the evidence. The new standard ignores the possibility that the juror's holdout status is a result of her assessment of the evidence, rather than the result of her misconduct. It thereby gives the trial court the discretion to reconstitute the jury to achieve a particular result, which the Elmore court sought to avoid. Elmore, 155 Wash.2d at 772, 123 P.3d 72.
¶ 61 In addition, the majority's new standard is an end-run around Elmore's protections of a defendant's rights to an impartial jury and a unanimous jury verdict. In Elmore, this court reasoned:
In order to protect the defendant's rights to an impartial jury and a unanimous jury verdict, once the evidence is gathered, the trial court must apply a heightened evidentiary standard[:] ... a deliberating juror may not be dismissed where there is any reasonable possibility that the impetus for dismissal is the juror's views of the sufficiency of the evidence.
Id. at 781, 123 P.3d 72. In balancing these rights, the need for jury secrecy, and the need for a court to investigate allegations of nullification, the Elmore court adopted the "reasonable possibility" standard in order to err on the side of protecting a defendant's rights. Id. at 777, 123 P.3d 72. The court reasoned, "any lower evidentiary standard could lead to improper dismissal of a juror based on his or her view of the sufficiency of the evidence." Id. at 776, 123 P.3d 72. The court specifically declined to adopt the California Supreme Court's standard, which
flip[s] the presumption, allowing dismissal if there is a demonstrable reality that the juror was acting improperly, rather than prohibiting dismissal if there is any reasonable possibility that the juror was acting properly.
Id. We noted that the "reasonable possibility" standard incorporates the presumption that jurors follow a trial court's instructions,
in that it requires the court, where there is conflicting evidence, to retain a juror if there is any reasonable possibility that the dispute among the jury members stems from disagreement on the merits of the case.
Elmore, 155 Wash.2d at 777-78, 123 P.3d 72.
¶ 62 The majority's new standard fails to provide the same protections that Elmore provided because, like the California standard this court rejected in Elmore, it flips the presumption, allowing dismissal if the judge determines the juror's alleged misconduct affected her ability to deliberate fairly, rather than prohibiting dismissal if there is any reasonable possibility the true impetus for dismissal is the juror's view on the evidence. Instead of erring on the side of protecting defendant rights, the new standard errs on the side of preserving a court's discretion to dismiss a juror for misconduct.
¶ 63 The majority's standard allows a trial court the discretion to dismiss a holdout juror accused of nullification so long as the court couches its reasoning in terms of misconduct rather than nullification. Such an approach defeats this court's efforts in Elmore to prevent a trial court judge from controlling the outcome of a case by dismissing a holdout juror based on the juror's views of the evidence. Thus, the majority's standard fails to adequately protect a defendant's rights to an impartial jury and a unanimous jury verdict.
¶ 64 The majority worries that extending Elmore to this case unreasonably handicaps a trial judge's discretion to dismiss jurors for misconduct. Similarly, the State argues that application of Elmore in this case means "no juror can ever be excused for unfitness, even for flagrant and egregious misconduct wholly unrelated to jury nullification, so long as he or she is voting for acquittal." Br. of Resp't at 16-17. However, application of Elmore to this case does not extend the standard any further than its original limitation to cases involving allegations of juror nullification, refusal to follow the law, or refusal to deliberate. Application of Elmore here merely requires the recognition that nullification by any other name elicits the same concerns with protecting defendant rights.
¶ 65 In any event, a juror's holdout status does not absolutely prevent dismissal. After the trial court determines there is no reasonable possibility that the true impetus for *230 dismissal is the juror's views of the evidence, the trial court has the discretion to dismiss a holdout juror for misconduct. Elmore, 155 Wash.2d at 778, 123 P.3d 72. This approach does not unreasonably handicap a trial court's discretion and is consistent with the Elmore court's concerns with protecting a defendant's rights to an impartial jury and a unanimous verdict.
¶ 66 For these reasons, I reject the majority's standard and believe Elmore applies here.
WE CONCUR: C. JOHNSON, J. JOHNSON and STEPHENS, JJ.
NOTES
[1] Nullification refers to "a juror's `knowing and deliberate rejection of the evidence or refusal to apply the law.'" Elmore, 155 Wash.2d at 761 n. 1, 123 P.3d 72 (quoting BLACK'S LAW DICTIONARY 875 (8th ed.2004)).
[2] Inadvertently, the court did gain insight into the jury's deliberations by learning about juror 3's opinions regarding the quality of the evidence and about her status as the holdout juror. However, this information came to the court's attention fortuitously rather than as a result of inquiry. Given the rarity of this situation, it is imprudent to further handcuff trial judges beyond the use of their discretion. In sum, that the judge gained knowledge he should not have does not call for this court to expand the Elmore test into new territory.
[3] While communications to third parties about jury deliberations might affect the ability of other jurors to deliberate by knowing that the secrecy of their deliberations has been breached, in this case juror 14 expressly denied that juror 3's communications influenced the members of the jury. VRP (July 15, 2005) at 20.
[1] This court defined jury nullification as

a juror's "knowing and deliberate rejection of the evidence or refusal to apply the law ... because the result dictated by law is contrary to the [juror's] sense of justice, morality, or fairness."
Elmore, 155 Wash.2d at 761 n. 1, 123 P.3d 72 (alterations in original) (quoting BLACK'S LAW DICTIONARY 875 (8th ed.2004)).
[2] Compare the Elmore court's definition of nullification. Elmore, 155 Wash.2d at 761 n. 1, 123 P.3d 72