IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 77529-4-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| HACH PHETH, | ) | |
| | ) | |
| Appellant. | ) | FILED: April 1, 2019 |

SCHINDLER, J. — Hach Pheth seeks reversal of the jury convictions for domestic violence assault in the second degree of K.C. and domestic violence rape in the first degree of K.C. Pheth claims the trial court violated his constitutional right to a fair and impartial jury by failing to conduct an adequate investigation of juror misconduct and abused its discretion in deciding that despite misconduct, the juror could deliberate. We affirm.

## FACTS

Hach Pheth and K.C. met in 2015. Pheth and K.C. were in an on-and-off romantic relationship. Pheth was "very jealous" and would often accuse K.C. of "having another man" and "a desire for a younger man." K.C. tried to end the relationship a number of times.

On August 25, 2016, the State charged Pheth with domestic violence assault in the second degree of K.C. on April 15, 2016, count 1; domestic violence rape in the first degree of K.C. on April 15, 2016, count 2; and domestic violence kidnapping in the first degree of K.C. between April 15, 2016 and April 17, 2016, count 3. The State filed an amended information charging Pheth with two additional counts of domestic violence rape in the first degree of K.C. between April 15, 2016 and April 17, 2016, count 4 and count 5. Pheth pleaded not guilty.

A number of witnesses testified at trial, including K.C., hospital social worker Emily McGuire-Wallace, sexual assault nurse Kathryn Clarke, emergency room physician Dr. Geoffrey Hubbell, King County Sheriff Deputy Brian Taylor, and Detective Patricia Maley. The court admitted a number of exhibits into evidence, including photographs showing injuries to K.C. Pheth did not testify.

K.C. testified that on Friday, April 15, 2016, Pheth called and wanted her to "come to his house" after work. K.C. told Pheth she "was tired" and planned to stay home. K.C.'s son and her sister left the house to celebrate the Cambodian New Year "around 7:30" p.m. After they left, Pheth called K.C. again and said he "wanted to see" her. K.C. told Pheth her son " 'will not allow you to come to this house.' " Pheth told her, " 'I going [to] kill you, bitch. Watch out.' "

Approximately 30 minutes later, K.C. heard Pheth knocking on the sliding glass door entrance to her bedroom. Pheth "sound[ed] angry" and asked her to "open the door." K.C. decided to let Pheth come in "so we can talk." Pheth "s[a]t on the bed" and told K.C. he wanted to have sex. K.C. said no. Pheth pulled off her nightgown, pushed her down onto the mattress, and forcibly inserted his fingers into her vagina. K.C. told

2

Pheth, " 'I don't want to' " and pushed his hand away. Pheth said, " 'Why are you saving this? Why don't you let me fuck you?' " Pheth grabbed nunchakus and hit naked K.C. on her back, her leg, her foot, the back of her head, and her forehead. Pheth "kept saying, 'Who are you saving this for? You're betraying me. Who are you saving this for?' "

Pheth stopped hitting K.C. and told her to get dressed. K.C. put on "whatever I could find at that moment," including a robe and a jacket. Pheth "pushed" K.C. outside "through the sliding door" and told her to get into her Toyota Highlander. K.C. testified that she ran next door and "knocked on the door, asking for help," but no one answered. Pheth "grabbed" K.C., "dragged" her back, and pushed her into the car. K.C. said she "did not want to go with him." When K.C. told Pheth, " 'I want to call the police,' " Pheth said he would kill her. Pheth "hit [her] more . . . with a fist." K.C. "put [her] hands up over [her] face" and used her arms "to protect myself."

Pheth started driving south toward Aberdeen. When K.C. tried to use her cell phone, Pheth "grabbed the phone from my hand" and "threw the phone" out the car window. K.C. said Pheth stopped at a gas station. K.C. did not try to "get out of the car" because "I could not move I was in so much pain." K.C. was bleeding "[f]rom my back" and the top of her head.

Pheth parked the car "behind the house" where his relatives lived in Aberdeen. Pheth "folded the back seat" down and made a bed with a sleeping bag. Pheth asked K.C. to have sex with him. K.C. said, " 'No, I cannot sleep with you because I'm in so much pain.' " Pheth took off K.C.'s clothes. K.C. said she tried to make Pheth stop "but he did not stop." K.C. testified that Pheth went to sleep after forcibly having sex with

3

her. K.C. did not try to run away because "[m]y body was in pain" and "I thought I would die."

The next morning, Pheth took K.C. inside the house to use the bathroom. Pheth stood by the door while K.C. took a shower. K.C. testified that Pheth threw away some of the clothes "stained with blood." Pheth "took [K.C.] back to the car" and drove to his sister's house. K.C. was scared Pheth "would beat me up again." K.C. "didn't dare to ask" Pheth's sister for help because he "watched me as I was his prisoner." K.C. testified that Pheth "washed my coat" because there "was a lot of blood."

Pheth drove K.C. "back to the other house" where he parked the night before. Pheth accused K.C. of "wanting another man." Pheth asked K.C. to "have sex with him again." K.C. told Pheth "no" but said she "was not strong enough to stop him" because she was in such "pain." K.C. "begged" Pheth to take her home.

K.C. testified that Pheth drove her back to her house Sunday evening. Before he left, Pheth asked K.C. for money. K.C. said, "I was trying just to get away from him." K.C. and Pheth drove to a nearby ATM.[1] After K.C. gave Pheth money, he left.

K.C. did not tell any of her family members "what had happened." K.C. testified, "I wanted them to know, but not at that time. And I was so tired, I was very depressed, and I did not want to tell them at that time."

K.C. went to work the next day. K.C. "was in pain" and "felt dizzy." Her supervisor told her to leave and go to a doctor. K.C. went to the Highline Medical Center emergency room.

---

[1] Automated teller machine.

4

Highline Medical Center social worker Emily McGuire-Wallace interviewed K.C. McGuire-Wallace called the police and referred K.C. to sexual assault nurse Kathryn Clarke. Clarke performed a forensic sexual assault examination and took photographs of K.C.'s injuries. Clarke testified there was "bruising to the very back of the opening of [K.C.'s] vagina" and "evidence that the outer layer of skin was damaged."

During her testimony, Clarke used a diagram to identify the "quite extensive" injuries to K.C. The court admitted the diagram and the photographs of K.C.'s injuries into evidence. Clarke "document[ed] 20 separate injuries from lacerations and bruising" and "20 different spots on [K.C.'s] body." K.C. had two black eyes, a "laceration in between her eyes," an "injury to the left side of her head radiating from the hairline towards the left eye," an "open wound" on "the back of her head," and "a cut to her shin." K.C. had multiple and overlapping bruises and swelling in her back, "inner arm," "the right hand . . . up the wrist," "all along" the left hand that "radiated to the wrist," the "lower left arm . . . front to back," "extensive bruising" to the left and right thighs that "wrapped all the way from below her buttocks . . . to the front of her thigh," her left knee and calf, the right knee, and "her foot radiating towards the inner portion of her ankle."[2]

Emergency room physician Dr. Geoffrey Hubbell examined K.C. K.C. told Dr. Hubbell that her " 'now ex-boyfriend . . . hit her in the head with his fists and possibly' " nunchakus. K.C. told Dr. Hubbell she " 'was with this man for the entire weekend, during which time, he repeatedly raped her.' " Dr. Hubbell testified that K.C. had difficulty walking and had " 'pain and bruising to her head, extremities, and throughout her torso.' " Dr. Hubbell ordered X-rays and a CT[3] scan.

---

[2] The "vaginal and labial swabs" "indicated the presence of semen."

[3] Computed tomography.

5

X-rays showed K.C. "had a broken finger." The CT scan showed a subdural hematoma and "areas of bleeding inside the skull." Dr. Hubbell testified that "[t]raumatic injury" to the head could cause a subdural hematoma.

> If you have any kind of trauma to the head, that can cause the brain to shift around inside of the skull and disrupt some of the blood vessels in there and cause you to leak blood into . . . the dura matter, which was the outermost layer of tissue surrounding the brain that I mentioned.

Dr. Hubbell said that "being hit over the head" with nunchakus could cause a subdural hematoma. Dr. Hubbell admitted K.C. to the hospital for three days to monitor her brain injuries because of his "concern that this might be a potentially worsening and potentially life-threatening condition." K.C. did not return to work for three months.

King County Sheriff Deputy Brian Taylor took photographs of K.C.'s injuries at the Highline emergency room. The court admitted the photographs into evidence. The photographs show "injuries to her face," "bruising around the top of her head" and "along the hairline," a cut on her nose, bruising and swelling on her left hand, and "bruising all along" the left arm.

Detective Patricia Maley testified she did not interview K.C. on Monday, April 18, because K.C. "was in pretty bad shape." "She had bruises all over her arms. Her face was bruised. She had cuts on her face. She had a cut over her nose." Detective Maley interviewed K.C. after she returned home from the hospital and took photographs of the injuries. The court admitted the photographs into evidence. The photographs show bruising on K.C.'s right arm, right "shoulder area," and inner left arm, an injury and bruising on her right hand, "huge swelling" and bruising on her left leg from her knee to her thigh, and bruising to the right leg and knee.

Detective Maley searched K.C.'s bedroom on Tuesday, April 19. Detective Maley found "blood on the pillowcases," "a large stain on the bedding," and "several other smaller stains . . . and what appears to be blood" on the sheets. Detective Maley seized "clear nunchucks [sic]" near the bed. The court admitted the photographs into evidence.

During the search of K.C.'s Toyota Highlander, Detective Maley seized "a sleeping bag and a blanket" from the back of the car. Detective Maley testified there were "some areas of discoloration that appeared to be blood" inside the sleeping bag. The court admitted photographs of K.C.'s car and items found inside the car into evidence. The photographs show "staining" that "appears to be blood" on the passenger seat and headrest. A photograph of the passenger seatbelt "appears to have [a] significant amount of blood on it." Detective Maley also found what appeared to be bloodstains on the passenger-side carpet and visor.

Detective Maley testified that Pheth admitted being in a "dating relationship" with K.C. but said he "hasn't seen her in a long time." When asked "about assaulting [K.C.] and beating her," Pheth "gave a little chuckle." Pheth said, "[I]t wasn't true, he didn't do it." Pheth said K.C. "fell through the sliding glass door" because "she was drunk."[4] Pheth said he "was drunk too." Pheth said he and K.C. "stayed in the car in a driveway of a friend's house." Pheth told Detective Maley, " 'If I had beat and raped her, why did she give me money from the ATM.' "

The jury deliberations began on August 21, 2017. At 11:15 a.m. on August 22, the "Presiding Juror," "Juror 8," submitted a written inquiry to the court. The written

---

[4] There was no evidence of damage to the sliding glass door to K.C.'s bedroom.

inquiry states, "While discussing time of day, a juror mentioned that they looked up the sunset time of day in regards to timeline in April, 2016." The court contacted the parties and scheduled a 1:45 p.m. hearing on the written inquiry. The State submitted a "Memorandum Regarding Juror Misconduct."

At the hearing to address the jury inquiry, the prosecutor suggested first questioning the Presiding Juror.

> I think it may, given the fact that the presiding juror sent this out, obviously there was some concern about it, would be to start with the presiding juror, bring that individual out, find out what, if any, information was actually disclosed. I think we then would need to question all of the other jurors to confirm that that is their understanding. We must do this in a manner so as not to ask them about their deliberations or where they're at in their deliberations or anything that inheres in the verdict to determine what, if any impact this might have going forward on a verdict.

The defense attorney agreed "we need to get some more information" and the court should avoid questioning the jurors about the jury deliberations. The defense attorney asked the court to question "every juror" and ask each juror the following questions:

> (A) What did the juror say? (B) Did what the juror say affect their ability to be fair? (C) Do they see any reason that they would not be able to disregard what the juror said and base their decision on the testimony and evidence that they heard during the course of the trial?

The court concluded, "[I]t's really undisputed that there was misconduct, that there — you pointed out to me that it's unclear whether the actual extrinsic evidence was shared or not, and I think it would be useful to clarify that." The court decided to initially question only the Presiding Juror and the juror who "looked up the sunset time of day . . . in April, 2016."

> My concern about pulling all 12 of them in and asking these questions is that it overemphasizes the issue. My inclination is gather

some more information either from the juror in question or the presiding juror, or both, and then discuss, should we learn something — you know, I think there are really two possibilities. There's the possibility that someone said, "You can't tell us that. We haven't even heard it," or there's the possibility that the juror shared that, you know, it got dark at 5:45 or whatever time in April. I suppose we could learn something more than that that would change the direction. Frankly, if either of those two were the case, my inclination would be to admonish the juror to do no further research, to not discuss the issue any further with anyone else, and then direct the jury as a whole to continue their deliberations. I feel like we draw more attention to it than is warranted if we interview all 12 of them.

The court first questioned Presiding Juror 8.

> COURT: . . . . [L]et me just say this before we go further. It's very important in the questions I ask you and in the questions I may ask any other jurors that you not disclose anything about the deliberations, about where they are in the process. And so really, I'm going to ask you some fairly pointed questions. I need you to, to the extent you're able, give me fairly specific answers.
> So as I understood it, what [the juror] said is that she looked up sunset in April of 2016.
> JUROR 8: Yes.
> COURT: And the question that we're really trying to get at is did someone go "Whoa, whoa, whoa, you can't talk about that; this is outside information" before she then said, "And it was 5:15" or "It was 6:45" —
> JUROR 8: Correct.
> COURT: Or did she actually give the information?
> JUROR 8: No. The fact that she researched something led us all to a halt.
> COURT: All right.
> JUROR 8: And that's where we stopped and agreed that we should send out a question.
> COURT: All right. And I will also need to have you tell me who the juror was who did that. Do you know what juror number it is?
> JUROR 8: Nine.

Presiding Juror 8 told the judge that she could follow the instructions "not to consider any evidence that comes from outside of what was presented" and would not "discuss anything that has been discussed here" with the other jurors.

The court questioned Juror 9. The court told Juror 9 it is "very important that we not hear . . . anything about . . . the progress of deliberations." Juror 9 testified that when she mentioned that she "looked up the sunset time of day" in April 2016 during the jury deliberation, "[e]veryone said, 'Stop, we're going to get thrown out.' " Juror 9 said she told the other jurors, " 'I haven't looked up anything else.' " Juror 9 testified there was no "further discussion" about what she reported. Juror 9 testified she could "disregard that information" she looked up and follow the court's instructions.

> COURT: And I'm going to ask you, and you're under oath, have you looked up anything other than that?
> JUROR 9: Nothing.
> COURT: All right.
> JUROR 9: Absolutely nothing.
> COURT: If I were to instruct to disregard that information that you looked up, do you believe that you would be able to follow that instruction?
> JUROR 9: Yes, I do.
> COURT: All right. So I'm now going to direct you not to have any discussion about what we've discussed in here or this matter with other members of the jury.

Juror 9 told the judge:

> I can swear that I have not sought any other information at all regarding this case. I haven't even been watching the news because I think you referenced national or local news. So I was just wondering w[h]at time does the sun set, you know, in April, when is it dark out? So that is what I was questioning.

The court rejected the defense request to question the other 10 jurors. The court denied the defense motion to excuse Juror 9. The court responded to the jury inquiry in writing. The court instructed the jury as follows:

> It is essential to a fair trial that everything you learn about this case comes to you in this courtroom, and only in this courtroom. You must not allow yourself to be exposed to any outside information about this case.

It is your duty to decide the facts in this case based upon the evidence presented to you during this trial.

Please continue deliberating and follow your instructions.

On August 23, the jury returned a verdict. The jury found Pheth not guilty of rape in the first degree of K.C. on April 15, 2016, count 2, and not guilty of rape in the first degree of K.C. between April 15 and April 17, 2016, count 5.[5] The jury found Pheth guilty of assault in the second degree of K.C. on April 15, 2016, count 1; kidnapping in the first degree of K.C. between April 15, 2016 and April 17, 2016, count 3; and rape in the first degree of K.C. between April 15, 2016, and April 17, 2016, count 4. By special verdict form, the jury found Pheth and K.C. were members of the same family or household prior to or at the time the crimes of assault in the second degree, kidnapping in the first degree, and rape in the first degree were committed.

At sentencing, the court vacated the kidnapping in the first degree of K.C. conviction "for the sole reason that conviction for both Count 3 and Count 4," rape in the first degree, "would violate double jeopardy principles." The court imposed a high-end standard-range sentence.

## ANALYSIS

Pheth seeks reversal of the jury convictions, arguing the court violated his constitutional right to a fair and impartial jury by failing to adequately investigate juror misconduct. The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee a defendant the right to trial by a fair and an impartial jury. State v. Slert, 186 Wn.2d 869, 874-75, 383 P.3d 466 (2016).

---

[5] The jury also found Pheth not guilty of the lesser included crimes of rape in the second degree and rape in the third degree as to count 2 and count 5.

The trial court has an obligation to investigate allegations of juror unfitness and "to excuse jurors who are found to be unfit, even if they are already deliberating." State v. Elmore, 155 Wn.2d 758, 773, 123 P.3d 72 (2005).

RCW 2.36.110 governs investigation of juror misconduct and dismissal of an unfit juror:

> It shall be the duty of a judge to excuse from further jury service any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service.

Pheth contends the court abused its discretion in deciding not to dismiss Juror 9 or interview the other 10 jurors. A trial court has broad discretion "in conducting an investigation of jury problems." Elmore, 155 Wn.2d at 773. A trial court abuses its discretion when the decision is manifestly unreasonable or based on untenable grounds. State v. Depaz, 165 Wn.2d 842, 858, 204 P.3d 217 (2009).

"Generally, questions of juror bias or incompetence focus on ' "some event, or . . . relationship between a juror and a party, that is both easily identifiable and subject to investigation and findings without intrusion into the deliberative process." ' " Elmore, 155 Wn.2d at 769[6] (quoting United States v. Symington, 195 F.3d 1080, 1087 n.6 (9th Cir. 1999) (quoting United States v. Thomas, 116 F. 3d 606, 621 (2d Cir. 1997))). One such example is where "a deliberating juror has discussed or considered extrinsic evidence." Elmore, 155 Wn.2d at 770. Here, there is no dispute Juror 9 committed misconduct by looking up the time of sunset. State v. Balisok, 123 Wn.2d 114, 118, 866 P.2d 631 (1994) (consideration of extrinsic evidence by a juror is misconduct).

---

[6] Alteration in original.

The court denied the defense request to question the other jury members because the other jurors did not consider extrinsic evidence. The court ruled:

> I believe that the way the jury has handled this reflects that they very clearly understand the instructions I gave them multiple times about the fact that their deliberations needed to be based solely on the evidence before them and they themselves have essentially enforced the court's order by the way they handled the situation. I think, in a sense it would be almost insulting to them to bring them out and tell them that again. Given the information that we've gleaned, I am not inclined to do that. I don't have any reason to believe that they're disregarding my order. In fact, I have every reason to believe that they're adhering very closely to what I directed them to do, with the exception of Juror No. 9, who we've now brought out and have made it very clear to her, and who has also I think credibly indicated that that was the sole area in which she sought out external information.

After the jury returned a verdict, the court entered findings on the determination that the other jurors did not consider extrinsic evidence.

> The [jury] question indicated that a juror had looked up the time of the sunset in April, 2016. We learned in questioning the presiding juror that it was Juror No. 9. We learned from both the presiding juror and Juror No. 9 that the other jurors had stopped her as soon as she said she had looked it up and that she had in fact not shared that information.
>
> . . . .
>
> I further find credible the testimony of the presiding juror and of Juror No. 9 that the other members did not receive what would have been extrinsic evidence in terms of the time of the sunset.
>
> I find that the other members of the jury did exactly what we hope jurors will do, and that is that they followed the court's instructions. They immediately told Juror No. 9 that they were not permitted to consider outside evidence, and immediately brought the issue to the attention of the court.
>
> I find that the extrinsic evidence was not shared with the rest of the jury.

We review findings of fact to determine whether they are supported by substantial evidence. State v. Boyer, 200 Wn. App. 7, 13, 401 P.3d 396 (2017). Credibility determinations are not subject to review. State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

The court found the testimony of the Presiding Juror and Juror 9 credible that Juror 9 did not disclose the extrinsic evidence. The Presiding Juror testified that the jurors stopped Juror 9 from disclosing extrinsic evidence. The record supports the decision not to excuse Juror 9 and the finding that the extrinsic evidence was "not shared with the rest of the jury." The court found Juror 9 engaged in misconduct. "I do find that . . . was misconduct on her part to have looked that up." But the court found "her testimony credible that that was the only information she looked up" and "found credible Juror No. 9's testimony that she believed that she could disregard, follow my instructions to disregard the information." Substantial evidence supports the courts findings. Juror 9 admitted she looked up the time of sunset in April 2016. Juror 9 testified under oath she looked up "[a]bsolutely nothing" else and would "not look up or seek out any extraneous information." Juror 9 testified that she was able to "disregard that information that [she] looked up." The court did not abuse its discretion by not interviewing the other 10 jurors.

Pheth also asserts the court used an incorrect legal standard to determine whether to excuse Juror 9. State v. Gaines, 194 Wn. App. 892, 380 P.3d 540 (2016), does not support the argument that the court erred in deciding not to interview each juror.

In Gaines, a juror told eight other jurors during deliberation that " 'he read in the newspaper 2 years ago, the "defendant has 2 priors." ' " Gaines, 194 Wn. App. at 895. The court excused the juror and interviewed "each of the eight affected jurors individually." Gaines, 194 Wn. App. at 895. The court found those jurors " 'could follow

[the instructions] that they would be impartial.' " Gaines, 194 Wn. App. at 895.[7] The defendant argued the trial court erred by asking "questions of the jurors' subjective ability to disregard extrinsic information before there is a verdict." Gaines, 194 Wn. App. at 898.

The defendant in Gaines cited cases that address a motion for a new trial to argue the court must "objectively inquir[e] into whether any prejudice could result" from the extrinsic evidence. Gaines, 194 Wn. App. at 897. The court drew a distinction between the inquiry for juror misconduct in a motion for a new trial and juror misconduct before there is a verdict. Gaines, 194 Wn. App. at 897-98. "When a jury hears extrinsic information and where that information inheres in the verdict, the trial court must make an objective inquiry, asking whether the evidence could have affected the jury's verdict." Gaines, 194 Wn. App. at 898[8] (citing Breckenridge v. Valley Gen. Hosp., 150 Wn.2d 197, 204, 75 P.3d 944 (2003)). But where, as here, a court considers juror consideration of extrinsic evidence during deliberations, instead of an objective inquiry, the court "may ask questions of the jurors' subjective ability to disregard extrinsic information." Gaines, 194 Wn. App. at 898.

In Depaz, the Washington Supreme Court states the court should determine

> whether any misconduct committed by the juror has affected the juror's ability to deliberate before deciding to excuse the juror under RCW 2.36.110. If the court decides that the juror can still deliberate fairly despite the misconduct, the court should not excuse the juror. Only if the misconduct reasonably would have altered the juror's formulated opinion of the case can the court disturb the deliberations that led the juror to reach such a decision.

Depaz, 165 Wn.2d at 857.

---

[7] Alteration in original.
[8] Emphasis in original.

Here, the uncontroverted record establishes Juror 9 did not tell the other jurors what she learned after looking up extrinsic evidence, and the court properly questioned Juror 9 about her subjective ability to disregard the extrinsic evidence and follow the instructions of the court. The record establishes the court used the correct legal standard to determine whether Juror 9 had the subjective ability to disregard the extrinsic evidence.[9]

In a statement of additional grounds, Pheth contends sufficient evidence does not support the convictions for domestic violence assault in the second degree and rape in the first degree. Evidence is sufficient to support a conviction if, viewing the evidence in the light most favorable to the State, any rational trier of fact can find the essential elements of the crime beyond a reasonable doubt. State v. Houston-Sconiers, 188 Wn.2d. 1, 15, 391 P.3d 409 (2017). The trier of fact is entitled to make credibility determinations and believe or disbelieve witnesses. Camarillo, 115 Wn.2d at 71. Viewing the evidence in the light most favorable to the State, overwhelming evidence supports the convictions.

Pheth contends his attorney failed to object to hearsay. There is a "strong presumption counsel's representative was effective." State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). The decision of when or whether to object is strategic and a "classic example of trial tactics." State v. Madison, 53 Wn. App. 754, 763, 770

---

[9] However, the record also shows the court relied on the State's incorrect statement of the law and engaged in an unrelated and inconsistent objective analysis of whether extrinsic evidence could have "impacted the verdict" and prejudiced the defendant.

P.2d 662 (1989); see McFarland, 127 Wn.2d at 335-36. Pheth cannot show ineffective assistance of counsel.[10]

We affirm the jury convictions for domestic violence assault in the second degree of K.C. and domestic violence rape in the first degree of K.C.

WE CONCUR:

---

[10] Pheth also claims the prosecutor committed misconduct and the court violated his due process rights. Because his assertions rely on "matters outside the record," we cannot review these arguments on direct appeal. McFarland, 127 Wn.2d at 337-38; RAP 10.10(c).

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON
2019 APR -1 AM 8:59