232 P.3d 597 (2010)
STATE of Washington, Respondent,
v.
Greg Richard HOPKINS, Appellant.
No. 38265-2-II.
Court of Appeals of Washington, Division 2.
June 8, 2010.
Sheri Lynn Arnold, Attorney at Law, Tacoma, WA, for Appellant.
Stephen D. Trinen, Pierce County Prosecutors Ofc, Tacoma, WA, for Respondent.

PART PUBLISHED OPINION
VAN DEREN, C.J.
¶ 1 Greg Richard Hopkins appeals his conviction for one count of second degree burglary. He argues that the trial court erred in dismissing a juror during deliberations, that evidence was improperly admitted, including a knife carried by Hopkins's companion, as well as all evidence gathered following Hopkins's purportedly unlawful seizure. Hopkins also claims that his trial counsel was ineffective for failing to seek suppression of the evidence. We affirm.

*598 FACTS
¶ 2 On June 28, 2007, at about 6:30 am Steilacoom Public Safety Officer Larry Whelan observed a suspicious vehicle near the local marina. Whelan lives in the immediate area and had never seen the truck before. He knew that the area near the marina is largely abandoned and prone to burglaries and vehicle prowls.[1]
¶ 3 Whelan looked in the truck's window and saw clothes, food, tools, and blankets, suggesting that someone was living in the truck. He then ran the vehicle plates on his mobile data computer, which returned with a photograph of the registered owner. He also checked the immediate area to see if someone might have gone into the nearby woods to sleep. He looked for someone walking around, did not find anyone, and also contacted some of the neighbors to see if the truck belonged to them.
¶ 4 As Whelan was contacting residents in the neighborhood, he observed Hopkins walking up the street with a woman, coming from the marina's direction. He recognized Hopkins from the photograph as the truck's registered owner.
¶ 5 Whelan approached the couple, asked how it was going, and what they were up to. The woman, Michelle Webb, was cooperative and friendly, but she seemed a little embarrassed. Hopkins became agitated about Whelan asking him questions. Hopkins swore at the officer and claimed he was having a romantic stroll on the beach with Webb. But Whelan observed a flashlight and a pair of gloves hanging out of Hopkins's pocket, and Hopkins was quite dirty, as if he had been working on something.
¶ 6 Whelan asked the two for identification. Webb provided her identification. Hopkins at first yelled and stomped and refused to give his identification, but then changed his mind and decided he would give his identification to Whelan, and went to the cab of his truck to retrieve it.
¶ 7 Hopkins's conduct caused Whelan concern for his safety, so he focused his attention on Hopkins as Hopkins reached into the truck cab. As this was occurring, Webb moved around behind Whelan and he saw that she had a knife in her hand. Whelan responded by drawing his gun and ordering the couple to the ground. Whelan called for priority backup. When it arrived, he handcuffed the two, patted them down for weapons, put them into two separate patrol cars, and read Webb her Miranda[2] rights.
¶ 8 After he interviewed Webb, Whelan read Hopkins his Miranda rights and interviewed him. Hopkins waived his rights and first claimed that he and Webb were just down at the beach for a romantic stroll. But later he told Whelan that he saw a mother raccoon and some babies in the marina, so he went inside to see them. Hopkins said he had the flashlight to see the raccoons and that he had the gloves to protect him from the raccoons. Hopkins told the officer that he had climbed over the main gate and then entered another door to go inside the marina and look around. Hopkins acknowledged that he knew the marina was closed and that he was not supposed to be in there.
¶ 9 Whelan then arrested Hopkins for burglary. When he searched Hopkins's person incident to the arrest, he found some wire in Hopkins's pants pocket.
¶ 10 After Whelan concluded his interview with Hopkins, he investigated the marina. He found a door to the marina forced open, showing indications that it had been kicked in. He also observed other fresh damage around the marina, including other doors that appeared to have been forced open. He also found fishing poles that appeared to have been readied for easy removal in the future.
¶ 11 The State charged Hopkins with one count of second degree burglary.
*599 ¶ 12 After hearing the evidence, the trial court's instructions, and closing arguments, the jury retired for deliberations. During deliberations, the jury submitted a note to the trial court stating:
One of the jurors feels unable to continue this case because of being too emotional regarding the prosecutor and police officer. She feels she can[]not be fair and impartial. She thought she could when being interviewed but can[']t now. She wishes to be dismissed at this time if possible.
Clerk's Papers (CP) at 50.
¶ 13 The trial court first consulted with the parties, then interviewed the presiding juror. The presiding juror indicated that the juror who felt she could not be fair had asked the presiding juror to so inform the court. The trial court then interviewed the juror in question, juror 6. The trial court asked very limited questions to ensure that it would not intrude on the jury's deliberations. Juror 6 indicated that the presiding juror's note was correct. The trial court also asked juror 6 if her position had changed since the note was given to the trial court, and she indicated that it had not. The trial court also asked her, "Is it the fact that you don't feel you can be fair and impartial to both sides?" Report of Proceedings (RP) at 322. The juror answered, "Exactly." RP at 322.
¶ 14 The trial court further conferred with the parties; the defense did not agree to dismiss the juror and asked the trial court to keep her on the jury. The trial court nonetheless removed juror 6 because she indicated that she could not be fair and impartial to both sides.
¶ 15 An alternate juror joined the panel. The trial court instructed the jury to disregard all previous deliberations and begin deliberations anew. The jury did so and returned a guilty verdict.
¶ 16 Hopkins appeals.

ANALYSIS

Dismissal of Juror 6
¶ 17 Hopkins argues that reversal of his conviction is required because the trial court failed to apply the appropriate legal standard when it dismissed a deliberating juror. We disagree.
¶ 18 RCW 2.36.110 provides:
It shall be the duty of a judge to excuse from further jury service any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service.
We review a trial court's determination to remove a juror for abuse of discretion. State v. Depaz, 165 Wash.2d 842, 858, 204 P.3d 217 (2009). But the basis of our review of the trial court's determination varies, depending on whether the juror is accused by another juror of engaging in nullification, State v. Elmore, 155 Wash.2d 758, 776, 777-78, 123 P.3d 72 (2005), whether there is evidence of juror misconduct and the trial court knows of the deliberating juror's substantive opinion of the case, Depaz, 165 Wash.2d at 857, 204 P.3d 217, or when no juror misconduct is alleged and the trial court has no knowledge of the juror's opinion about the case, which we have here. See RCW 2.36.110.
¶ 19 Hopkins contends that Elmore is the controlling case law on the issue of dismissal of a juror during deliberations, and the trial court's failure to apply the "reasonable possibility" standard articulated in that case was error. Br. of Appellant at 30. In Elmore, our Supreme Court adopted the rule that "where a deliberating juror is accused of refusing to follow the law, that juror cannot be dismissed when there is any reasonable possibility that his or her views stem from an evaluation of the sufficiency of the evidence." 155 Wash.2d at 778, 123 P.3d 72. The Elmore court "emphasize[d]" that the articulated standard "is applicable only in the rare case where a juror is accused of engaging in nullification, refusing to deliberate, or refusing to follow the law." 155 Wash.2d at 778, 123 P.3d 72. That is not the case here. No other juror accused juror 6 of engaging in nullification, refusal to deliberate, or refusal to follow the law.
¶ 20 Eleven days before Hopkins filed his opening brief, our Supreme Court reiterated *600 in Depaz, that Elmore is confined to the rare circumstances where a juror accuses another of nullification, refusing to deliberate, or refusing to follow the law. Depaz, 165 Wash.2d at 855, 204 P.3d 217. The Depaz court held that in cases where such "accusations" are absent, the trial court's decision to dismiss a juror is to be reviewed under RCW 2.36.110. 165 Wash.2d at 855, 204 P.3d 217. "Notwithstanding Elmore, the standard of review for juror removal during deliberation is abuse of discretion." Depaz, 165 Wash.2d at 858, 204 P.3d 217. A trial court abuses its discretion when it issues an order that is manifestly unreasonable or based on untenable grounds. Depaz, 165 Wash.2d at 858, 204 P.3d 217.
¶ 21 Depaz addressed the circumstance where a trial court dismissed a holdout juror. The status of deliberations and the juror's position became known to the trial court inadvertently, when the court questioned the juror after other jurors had reported the juror's contact with a third party during deliberations. The Depaz court declined to extend the Elmore standard to this circumstance (i.e., simple misconduct in failing to follow the court's no-contact instruction), and held:

[W]here the trial court has knowledge of a deliberating juror's substantive opinion of the case, trial courts must make a determination regarding prejudice. Prejudice should be determined by concluding whether any misconduct committed by the juror has affected the juror's ability to deliberate before deciding to excuse the juror under RCW 2.36.110. If the court decides that the juror can still deliberate fairly despite the misconduct, the court should not excuse the juror. Only if the misconduct reasonably would have altered the juror's formulated opinion of the case can the court disturb the deliberations that led the juror to reach such a decision.
Depaz, 165 Wash.2d at 857, 204 P.3d 217 (emphasis added).
¶ 22 The Depaz court concluded that "[r]equiring a trial court to determine prejudice before it removes a holdout juror protects the defendant's right to a unanimous jury by assuring that the desire for a particular outcome has not influenced the court's decision to remove a juror." 165 Wash.2d at 858, 204 P.3d 217. Here, the prerequisite that triggers the trial court's obligation to make a prejudice determination (i.e., knowledge of the deliberating juror's substantive opinion) is absent. Neither Elmore nor Depaz impose limitations on the trial court's exercise of discretion under RCW 2.36.110 under the circumstances of this case.
¶ 23 Here, juror 6 asked the presiding juror to tell the trial court that she thought she could not be fair and impartial. There was no accusation by any other juror about any misconduct by juror 6. The trial court asked juror 6, "Is it the fact that you don't feel you can be fair and impartial to both sides?" RP at 322. Juror 6 replied, "Exactly." RP at 322. The trial court asked, "Has there been anything that's happened outside your deliberations, any outside influence, that has led you to this conclusion?" RP at 322. Juror 6 replied, "No." RP at 322. The trial court sent juror 6 back to the jury room, heard argument from the parties, and ultimately dismissed juror 6. The court substituted an alternate juror, and instructed the jury to begin deliberations anew. In so concluding, the trial court noted:
I have been racking my brain for a way to inquire further to try to flesh out the nature of the juror's concern, and I just can't come up with one that is not going to invade the province of the jury to some degree. I am absolutely convinced from observing the juror and the firmness with which she answered and the quickness with which she answered that she truly believes she cannot be fair and impartial
. . .
Given that fact and given the Hobson's choice that the Court is placed in, I don't see how we can have a fair resolution if we have a juror who I think we have to trust cannot be fair and impartial. I am going to propose to excuse the juror and bring back the alternate tomorrow.
RP at 327.
¶ 24 Hopkins's counsel agreed that the trial court could not "really delve any further" but objected to dismissing juror 6, based on his belief that juror 6 had "issues with the credibility of the officer." RP at 324. On *601 appeal, Hopkins argues that the trial court should have applied the "`any reasonable possibility'" standard that the juror's views "`stem from an evaluation of the sufficiency of the evidence.'" Br. of App. at 29 (quoting Elmore, 155 Wash.2d at 778, 123 P.3d 72). But here, the trigger for applying that standard, accusation by another juror of nullification or misconduct, is absent. Moreover, it is pure speculation that juror 6's conclusion that she could not be fair was related in any way to the evidence presented at trial. No evidence was before the trial court about the basis of juror 6's decision that she should no longer serve on the jury due to her inability to be fair to both parties. If the trial court had asked for the specific basis of juror 6's change of position on being able to deliberate on the evidence fairly and impartially for both parties, it risked intruding on the jury's deliberative process and a likely mistrial.
¶ 25 Given the statutory duty imposed on the trial court to excuse from service any juror who has manifested unfitness by reason of bias, it cannot be said that that the trial court abused its discretion in excusing juror 6 when that juror candidly admitted to such bias, and we so hold.
¶ 26 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.
I concur: PENOYAR, J.
ARMSTRONG, J. (dissenting).
¶ 47 I believe Elmore's "reasonable possibility" standard applies here. And because under such standard, there is a reasonable possibility the excused juror's claimed unfairness stems at least in part from her view of the State's case, I would reverse and remand for a new trial.
¶ 48 In State v. Elmore, 155 Wash.2d 758, 123 P.3d 72 (2005), two jurors accused a third of being prejudiced and refusing to follow the law. Upon questioning by the court, the accused juror denied saying that he, in effect, would not follow the law, explaining that what mattered was whether "we believe the witnesses are credible." Elmore, 155 Wash.2d at 765, 123 P.3d 72. The Supreme Court adopted the Ninth Circuit's test that where the claim of juror bias and refusal to follow the law first arises during deliberations, the trial court cannot excuse the challenged juror if there is any reasonable possibility the juror's views are based on an evaluation of the sufficiency of the evidence. Elmore, 155 Wash.2d at 778, 123 P.3d 72. But the court limited the "reasonable possibility" standard to the "rare case where a juror is accused of engaging in nullification, refusing to deliberate, or refusing to follow the law." Elmore, 155 Wash.2d at 778, 123 P.3d 72.
¶ 49 Recently, in State v. Depaz, 165 Wash.2d 842, 204 P.3d 217 (2009), the court reiterated its limits on use of the "reasonable possibility" standard. Depaz involved juror misconduct clearly unrelated to the jury's deliberations: the challenged juror had talked with her husband during deliberations about the "circumstantial evidence" and being in the "minority." Depaz, 165 Wash.2d at 847, 204 P.3d 217. The court explained that it adopted the "reasonable possibility" test to allow the trial court to ascertain whether the challenged juror is truly unwilling to follow the law without invading the secrecy of jury deliberations. Depaz, 165 Wash.2d at 855, 204 P.3d 217. But this conflict does not exist where the court can explore juror misconducttalking with someone outside the jury room during deliberationswithout delving into juror deliberations. Depaz, 165 Wash.2d at 855, 204 P.3d 217. Thus, the court refused to apply the "reasonable possibility" standard. Depaz, 165 Wash.2d at 855, 204 P.3d 217.
¶ 50 Here, we do not have a claim of juror misconduct. Rather, like Elmore, the claim centers on possible juror prejudice or partiality. And, like Elmore, the trial court could not evaluate the claim without risking invading the jurors' secret deliberative process. I find no meaningful difference between the situation where one juror accuses another of being partial and that where a juror decides during deliberations that she is no longer impartial. In the first situation, the accusing juror may simply want to remove a hold-out *602 juror, and in the second, the self-accusing juror may simply want out of a contentious, confrontational discussion. In either situation, the trial court faces the same dilemma: how to ascertain the true source of the claimed partiality without invading the jury's secret deliberative process. Because the dilemma is the same in either case, I would apply the "reasonable possibility" test here. See United States v. Symington, 195 F.3d 1080, 1088 (9th Cir.1999) (error to dismiss juror because it was reasonably possible that impetus for removal came from her position on merits of case); United States v. Thomas, 116 F.3d 606, 624 (2d Cir.1997) (error to dismiss juror on ground he acted in purposeful disregard of court's instructions where there was reasonable possibility he was simply unpersuaded by government's case against defendants); United States v. Brown, 823 F.2d 591 (D.C.Cir.1987) (error to excuse juror who reported he was unable to discharge his duties after five weeks of deliberations because of possibility that discharge request was based on insufficient evidence to convict).
¶ 51 I find a reasonable possibility that juror six's claim of partiality arose, at least in part, from her view of the evidence. The majority reports only one note from the jury; the jury actually sent out four notes. The first asked if the jury could see the police report; the second asked, "If you lawfully entered a building and then your intent to commit the crime became present, is it still burglary?" Verbatim Report of Proceedings (VRP) at 308; the third asked, "Is it illegal for a member of law enforcement to allow a piece of evidence to leave his or her sight?" VRP at 310; and the last note read:
One of the jurors feels unable to continue this case because of being too emotional reg[arding] the prosecutor and police officer. She feels she can not be fair and impartial. She thought she could when being interviewed but can[']t now. She wishes to be dismissed at this time if possible.
Clerk's Papers (CP) at 50, 92.
¶ 52 Hopkins's defense was that he and his friend were walking on the beach and because they were thirsty, he walked to the store, which was unlocked and appeared to be open. He entered, calling out, and when nobody responded, he left. He explained that he had the piece of wire in his pocket because he had worked on his truck. He denied that the piece of wire entered into evidence was the same wire he had in his pocket.
¶ 53 Officer Whelan testified that he gave the piece of wire from Hopkins's pocket to David Morgan, an electrician who works for Steilacoom's electrical department. Morgan went to the allegedly burgled store where he found a bunch of coiled-up wire. He matched the piece of wire to a missing section of the coiled wire. Morgan testified that the piece of wire did not appear to have been cleanly cut, but he had previously told defense counsel he thought a wire cutter had been used.
¶ 54 The jurors' second question suggests that some had concerns about whether the State had proved Hopkins had the intent to steal when he broke into the store. The third question suggests that some of the jurors had problems with the State's control and processing of the allegedly stolen wire.
¶ 55 The fourth and critical note then reports that juror six was being "too emotional reg[arding] the prosecutor and police officer" and believed she could not be fair and impartial. CP at 50 (emphasis added). In response to the court's questions, juror six agreed to the sentiments stated in note four. But, if we consider the fourth note in light of the jury's first three questions, it is reasonably possible that juror six, either alone or with others, questioned the State's proof as to Hopkins's intent in entering the store and, more importantly, questioned whether the officer's release of the wire to the electrician was legal. This record demonstrates a reasonable possibility that the source of juror six's discontent was the State's evidence. This is particularly likely where the juror expressed no partiality during voir dire, the trial testimony, final arguments, or even the first day of deliberations.
¶ 56 I fully sympathize with the trial court's frustration about how to question juror six. After the juror confirmed that note *603 four accurately reported her feelings, the court asked only whether anything outside deliberations or any outside influence had led her to believe she could no longer be impartial. The juror answered "no," an answer that supports rather than removes a reasonable possibility that her view of the State's case contributed to her partiality. The court's approach followed what other courts have attempted in similar situations and questioned the juror about what, other than deliberations, caused the claimed partiality. Thomas, 116 F.3d at 620-21. Because some "claims of partiality or bias often arise from some event, or from a relationship between a juror and a party," the court can identify, investigate, and make findings on such matters without intruding into the deliberative process. Thomas, 116 F.3d at 621. If nothing outside of deliberations has caused the juror's partiality, it becomes a near certainty that the deliberative discussions have. Finally, even if the juror inadvertently reveals her views or those of other jurors, this is not fatal to further deliberations. Depaz, 165 Wash.2d at 855 n. 2, 204 P.3d 217.
¶ 57 In conclusion, the court's questions here did not remove the reasonable possibility that juror six's "partiality" stemmed from her view of the State's case. Accordingly, the trial court erred in excusing her in violation of Hopkins's constitutional right to be convicted only by a unanimous jury. Elmore, 155 Wash.2d at 781, 123 P.3d 72.
NOTES
[1] The marina itself had been burgled many times. The facility included a boat storage area, a seasonal tackle and convenience store, a mechanical shop, and living quarters where the owner and her father lived. The marina kept irregular business hours and was not open on June 28, 2007. That day, the marina's entrance doors and storage areas were locked.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).