# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | DIVISION ONE |
| Respondent, | ) | No. 72168-2-I |
| v. | ) | UNPUBLISHED OPINION |
| ANDREW WILLIAM DEMPSEY, | ) | |
| Appellant. | ) | FILED: September 28, 2015 |

DWYER, J. — Andrew Dempsey appeals from the judgment entered on the jury's verdict finding him guilty of attempted rape of a child in the second degree and violation of the Uniform Controlled Substances Act, chapter 69.50 RCW. Dempsey claims that the trial court erred in the manner in which it instructed the jury on reasonable doubt and by not removing a juror who stared at Dempsey and his counsel during closing arguments. Dempsey also claims that he received ineffective assistance of counsel at trial. Finding no error, we affirm.

I

On October 3, 2012, the State charged Andrew Dempsey with count 1, attempted rape in the second degree, and count 2, violation of the Uniform Controlled Substances Act, for felonious possession of methamphetamine. Prior to trial, the State moved to amend count 1 to attempted rape of a child in the

second degree. The trial court granted the motion. Dempsey pleaded not guilty to both charges. The evidence presented at trial is summarized as follows.

On September 29, 2012, 11 year-old J.M. went shopping with his mother and two sisters at an Albertson's store in Burien. J.M. went by himself to use the men's restroom. The restrooms are located adjacent to an employee break room. The restroom has two urinals and two individual stalls. The light in the men's restroom is activated by a motion sensor.

J.M. testified that, when he entered the restroom, the light was turned off and it smelled like cigarettes. The light eventually turned on and he proceeded to use one of the stalls. After J.M. emerged from the stall, he had a "bad feeling," heard a door slam behind him, and turned to see Dempsey "charging" at him. J.M. could see that Dempsey's pants were down and his penis was "a little bit straight. . . . I think it was erected." Dempsey grabbed J.M. from behind, placed his hand over his mouth, put him in a headlock, and threatened to kill him. J.M. told Dempsey, "Okay, okay, stop. I'll do whatever you want, however you want me to do [it]." The two struggled for some time before store employees heard J.M. cry for help.

In addition to J.M.'s account of the incident, the jury heard testimony from several store employees who responded to the incident, including Teasha Ward, Barbara Kallstrom, Terrie Carlson, and Laurissa Engelhardt.

Ward testified that she was on her way to the break room when she heard several cries for help. Kallstrom and Carlson, who were in the break room, heard

"banging" and "some rustling around." Carlson went to the women's restroom and Ward went to the men's restroom to investigate.

When Ward opened the door, she saw Dempsey, with his pants down to his ankles and his arms around J.M's neck. She could not see Dempsey's penis. Ward then asked Dempsey, "What the fuck are you doing?" Dempsey looked confused and did not respond. J.M. said to Ward, "Help me, he's hurting me." Dempsey let go of J.M. and he ran out of the restroom, yelling "[Dempsey's] trying to kill me, [Dempsey's] trying to kill me." Ward yelled from the bathroom that Dempsey was trying to rape J.M.

Engelhardt testified that she saw J.M. running from the bathroom so she accompanied him to the self-check-out area, far away from the bathroom. Several people telephoned 911. While Engelhardt was waiting with J.M. for the police to arrive, she observed that he became increasingly upset, looked toward the bathroom, and said, "[Dempsey's] going to kill me, [Dempsey's] going to kill me." It was in the self-check-out area that J.M. was reunited with his family.

Kallstrom and Carlson saw Dempsey emerge from the bathroom a short time later. He was carrying a backpack with him. Kallstrom testified that as Dempsey exited the restroom he looked "sheepish," was walking "very slow[ly]," and appeared to be zipping or fastening his pants. Carlson, whose three brothers are addicts, described Dempsey as "higher than a kite" with dialated eyes.

As Dempsey started to make his way toward an exit, he was approached by the manager, who told Dempsey that he could not leave the store. Dempsey

-3-

resisted. Several employees assisted in wrestling Dempsey to the ground. Dempsey bit one employee. In all the commotion, some of the items in Dempsey's bag were scattered on the floor, including several hypodermic needles. Store employees remained on top of Dempsey until the police arrived.

Shawna Miller, a store customer and a Department of Social and Health Services children's administration program manager, was one of the several people who telephoned 911. Miller was with J.M. and his family when she spoke with the 911 dispatcher. She testified that she was not asked to provide a statement to police until January 2013, and that "the details [of the incident] are muddled in some ways." However, she recalled seeing J.M. "extremely upset, and distressed, and emotional" upon being reunited with his mother. Moreover, based on her training in chemical dependency and her experience in observing people under the influence of various substances, Miller described Dempsey as "intoxicated." She testified that her opinion was based on Dempsey's "actions and demeanor," describing that:

> He appeared disorganized. He appeared that his clothes were in various states of undress. His pants were down. He was thrashing around and struggling against four people holding him down, which is not typical of a person who is stone-cold sober. So I would expect a person who was not under the influence would be still, and be explaining what was going on rather than fighting against, you know, adult men holding him down. Those were the indicators.

She opined that such behavior is consistent with methamphetamine use.

In addition to the accounts of store employees and customer Shawna Miller, the jury heard testimony from several law enforcement officers who were

-4-

involved in responding to the incident including Deputies Benjamin Miller and Robin Ostrum, and Detectives Christine Elias and Marylisa Priebe-Olson.

Deputy Miller was the first officer to arrive at the scene. Upon arrival, he saw that Dempsey was being held by several employees who were physically piled on top of Dempsey in order to prevent him from leaving. Miller handcuffed Dempsey and conducted a pat-down to check him for weapons. When Miller rolled Dempsey to his side, he could see that his pants were undone and his zipper was all the way down. It was apparent to Miller that Dempsey was not wearing underwear because he "could see [Dempsey's] pubic hair and part of his penis."

Deputy Ostrum next arrived on the scene. She and Miller escorted Dempsey to a patrol car. Miller then transported Dempsey to the police station. Ostrum testified that Dempsey's appearance was consistent with the homeless population as well as "some" meth addicts and users. However, Dempsey did not exhibit any "hyper vigilance" or "paranoid" behavior. Dempsey's demeanor

> was not overtly indicative of people [Ostrum] generally talk[s] to who are on meth. Their slang term for it is "tweakers." And because they have sort of a tweaking, jerking, sort of very quick, very spastic, very just, like this the whole time you're talking to them. . . . Dempsey was not exhibiting that type of behavior, so his initial demeanor to me, in dealing with at the scene, did not speak to that. And I did not observe any sort of an odor of alcohol on or about his person.

Next, Ostrum returned to the store in order to secure Dempsey's bag and its contents into evidence. She collected the items that were scattered on the floor, locked them in her patrol car, and took them back to the police station to be

processed into evidence.[1] The contents of Dempsey's bag included tarot cards, clothing, compact discs, a receipt, a lanyard and key, hypodermic needles, and a bag containing a "white rock substance." This white substance was later identified as methamphetamine.

Detective Elias testified about the condition of Dempsey's clothing at the time that he was booked into custody. She recalled that his pants had no button, the zipper was pulled down "a little bit," and that his clothes were damp even though it was not raining that day. She testified that the clothing of methamphetamine users can become damp from sweat as a result of rising body temperature. No blood sample was ever taken from Dempsey to test for intoxication.

Detective Priebe-Olson interviewed J.M. and Dempsey at the police station after the incident. Priebe-Olson testified that she took several photos of J.M's injuries, including red marks on his face, neck, and shoulder. Regarding her interaction with Dempsey, Priebe-Olson testified that he appeared to be under the influence of something when she interviewed him, had sores, and seemed "agitated and twitchy." She testified that "it's possible" that Dempsey's behavior was indicative of a methamphetamine user.

In closing argument, the State argued that being under the influence of methamphetamine was not a defense to the attempted rape charge. Although Dempsey did not seek a jury instruction on the defense of voluntary intoxication,

---

[1] Everything in Dempsey's bag was individually entered into evidence, except for the hypodermic needles because those were sharp. According to Ostrum's testimony, the department has a policy of disposing of potential biohazards or injurious sharp objects.

defense counsel argued that Dempsey lacked the requisite intent to rape J.M. because he was high on methamphetamine. Defense counsel asked the jury to convict Dempsey on the drug possession charge and acquit him on the attempted rape charge.

Outside the presence of the jury, after closing arguments (but before deliberations), one of Dempsey's two attorneys expressed concern regarding the potential inability of juror number one to remain impartial, asserting that the juror was crying and staring at Dempsey and his other counsel during closing arguments. Dempsey's lawyer requested that juror number one be designated as an alternate and, thus, not deliberate. In response, the trial court observed that:

> Juror Number One was fixated visually at an angle. I did not see her wiping her eyes with any kind of indication of -- that she was crying. But I did notice that the juror seemed to be unable to follow as the different attorneys were talking here in the -- in the front. She seemed to be fixated in one direction.
>
> And unlike the other jurors who kind of watched what was going on, that one juror was -- I don't want to say in a trance. I don't want to say that she was -- but there was something very unique about her approach and the way that she watched counsel. I did notice that.

The court asked whether an individual inquiry of juror number one was desired. Dempsey's attorney declined the invitation to question the juror. The court permitted a recess for counsel to research the issue. After the recess, the court heard the arguments of counsel and denied the defense request.

The jury found Dempsey guilty on both counts. He was sentenced to 72 months of confinement and now appeals.

II

Dempsey contends that the trial court erred in the way that it instructed the jury on the concept of reasonable doubt. The trial court's instruction was in the language of the standard Washington Pattern Jury Instruction 4.01. See 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.01, at 27 (3d ed. Supp. 2014) (WPIC). The challenged instruction was as follows:

> The defendant has entered a plea of not guilty. That plea puts in issue every element of each crime charged. The State is the plaintiff and has the burden of proving each element of each crime beyond a reasonable doubt. The defendant has no burden of proving that a reasonable doubt exists as to these elements.
> A defendant is presumed innocent. This presumption continues throughout the entire trial unless during your deliberations you find it has been overcome by the evidence beyond a reasonable doubt.
> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence.

Jury Instruction 3.

This instruction was specifically approved of by the Washington Supreme Court. State v. Bennett, 161 Wn.2d 303, 317, 165 P.3d 1241 (2007). Indeed, our Supreme Court has mandated that trial courts give this very instruction. Bennett, 161 Wn.2d at 318. There was no error.

III

Dempsey next contends that the trial court erred by denying his request—made at the conclusion of closing arguments—to designate juror number one as

-8-

an alternate juror.[2] Dempsey describes the basis for this request as follows: "Juror One demonstrated bias and inattention before deliberations began when she cried during the State's closing and then fixated on Dempsey during defense counsel's closing." Br. of Appellant at 13. Because Dempsey's assertions of juror bias and inattention never rose above the level of speculation or conjecture, the trial court did not err by denying the requested relief.

A statute provides that:

It shall be the duty of a judge to excuse from further jury service any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service.

RCW 2.36.110.

Moreover, a court rule provides that:

If at any time before submission of the case to the jury a juror is found unable to perform the duties the court shall order the juror discharged, and the clerk shall draw the name of an alternate who shall take the juror's place on the jury.

CrR 6.5. Taken together, RCW 2.36.110 and CrR 6.5 "place a continuous obligation on the trial court to excuse any juror who is unfit and unable to perform the duties of a juror." State v. Jorden, 103 Wn. App. 221, 227, 11 P.3d 866 (2000).

Whether a juror has demonstrated bias or inattention is a determination that falls within the discretion of the trial court. State v. Morfin, 171 Wn. App. 1,

---

[2] This is an odd remedy request. If the juror is competent to serve, there is no basis for granting such a request. If the juror is not competent to serve, then the juror should be discharged—not held in reserve as an alternate. We view the request, and the assignment of error, as one to discharge the juror.

7, 287 P.3d 600 (2012). The trial court has discretion to investigate allegations of misconduct in the manner most appropriate to the particular case. State v. Elmore, 155 Wn.2d 758, 774-75, 123 P.3d 72 (2005). In determining whether to excuse a juror for bias or inattention, the trial court necessarily acts as both an observer and decision-maker. Jorden, 103 Wn. App. at 229. Indeed, "[i]n deciding whether to grant or deny a challenge for cause based on bias, the trial judge has 'fact-finding discretion.'" Jorden, 103 Wn. App. at 229 (quoting Ottis v. Stevenson-Carson Sch. Dist. No. 303, 61 Wn. App. 747, 753, 812 P.2d 133 (1991)). "As with other factual determinations made by the trial court, we defer to the judge's decision." Jorden, 103 Wn. App. at 229. A court abuses its discretion only "when its decision adopts a view that no reasonable person would take or that is based on untenable grounds or reasons." State v. Boyle, 183 Wn. App. 1, 13, 335 P.3d 954 (2014).

Criminal cases can often be emotional for the participants. The key is not whether a juror has displayed emotion. The key is whether the juror is unfit to serve. As another court recently noted in a similar case:

> Lastly, [defendant] Gumbs argues that the District Court abused its discretion when it chose not to remove a juror who cried while viewing video of Gumbs engaged in sexual activity with the eight year-old victim. . . .
>
> "A criminal defendant is entitled to a determination of his or her guilt by an unbiased jury based solely upon the evidence properly admitted against him or her in court." Gov't of the V.I. v. Dowling, 814 F.2d 134, 137 (3d Cir. 1987). The District Court is best positioned to preserve such entitlements, as it can observe and interact with the jury, and determine what, if any, investigation the circumstances demand.

> Before the jury retired to deliberate, the District Court met with counsel to discuss the possibility of discharging the juror who had cried during trial. The District Court commented to counsel that "the images"—that is, video of Gumbs engaging in sexual activity with the eight year-old victim—"certainly might provoke some reaction," and that such emotion would not necessarily render the juror "unfair or impartial." We agree. Cf. State v. Lacy, No. 99-2625-CR, 246 Wis.2d 672, 2001 WL 477411, at *4 (Wis. Ct. App. May 8, 2001) (per curiam) ("[J]urors sometimes cry in difficult cases and the simple fact that this particular juror cried during the victim testimony did not mean that she could not be impartial.")

United States v. Gumbs, 562 Fed.Appx. 110, 115-16 (3d Cir. 2014).

Dempsey claims that juror number one cried during the prosecutor's closing argument and stared at Dempsey and his second attorney while Dempsey's first attorney gave closing argument. This, according to Dempsey, indicated both inattentiveness and bias (in that juror number one had made up her mind prior to the commencement of deliberations). Dempsey's counsel desired that the court decide their request without questioning any of the jurors.

The trial judge did not observe juror number one crying but did observe the juror's elongated gaze in Dempsey's direction during argument. Based on the trial judge's explanation for his ruling, we do not perceive the discrepancy about whether the juror was crying to have been significant to the ruling.

> JUDGE McCULLOUGH: Thank you. The Court is going to at this time deny the motion.
> Number one: both parties are correct in citing to RCW 2.36.110 which indicates that a juror can be dismissed by manifesting unfitness by reason of indifference, bias, and so forth.
> Number two: the Court does not believe that staring at defense counsel, or even at the defendant translates to inattention.
> I did note, and stated on the record, that I did see the juror looking intently in that direction. But, can I conclude that by doing so she's not listening or processing the information in another way? I can't do that.

> The record, therefore, doesn't establish that the juror has engaged in [mis]conduct, and that there is any inattentiveness at this point, that would support this motion on the part of the defense.
>
> Furthermore, it's not clear—the Trial Court does not have any information about this potential juror's substantive opinion about the case. . . .
>
> I don't have any complaints from the fellow jurors that this person has not been paying any attention.
>
> And then, finally, there's the case of <u>State versus Hopkins</u>[3] where the juror just admitted that she or he was—that they were biased.
>
> I don't have any of that. . . .
>
> But on this record, I am unable to determine that there is a basis for finding that this juror should be excused.

The trial judge was in the best position to evaluate the circumstances surrounding the juror's competency. The judge did so thoroughly and thoughtfully, given the limited facts before the court. The experienced trial judge did not abuse his discretion in refusing to discharge the juror.

IV

In a supplemental assignment of error, Dempsey contends that his trial counsel were constitutionally ineffective because they did not request that the jury be instructed on the defense of voluntary intoxication. We disagree.

We apply the two-part test from <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), to determine whether a defendant has constitutionally sufficient representation. <u>State v. Cienfuegos</u>, 144 Wn.2d 222, 226-67, 25 P.3d 1011 (2001). "'First, the defendant must show that counsel's performance was deficient.'" <u>Cienfuegos</u>, 144 Wn.2d at 226 (quoting <u>Strickland</u>, 466 U.S. at 687). To establish deficient performance, a defendant must

_____

[3] 156 Wn. App. 468, 232 P.3d 597 (2010).

"demonstrate that the representation fell below an objective standard of reasonableness under professional norms." State v. Townsend, 142 Wn.2d 838, 843-44, 15 P.3d 145 (2001). Second, the "'defendant must show that the deficient performance prejudiced the defense.'" Cienfuegos, 144 Wn.2d at 227 (quoting Strickland, 466 U.S. at 687). "Proving that counsel's deficient performance prejudiced the defense 'requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" State v. Hicks, 163 Wn.2d 477, 488, 181 P.3d 831 (2008) (quoting Strickland, 466 U.S. at 687). Reversal of the outcome of a trial court proceeding is required only when the defendant demonstrates both deficient performance and resulting prejudice. Strickland, 466 U.S. at 687.

Moreover, with regard to the first part of the Strickland test, there is a strong presumption that trial counsel's performance was adequate, and exceptional judicial deference must be given when evaluating counsel's strategic decisions. Strickland, 466 U.S. at 689; State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). If trial counsel's conduct can be characterized as legitimate trial strategy or tactics, it cannot serve as a basis for a claim that the defendant received ineffective assistance of counsel. State v. McNeal, 145 Wn.2d 352, 362, 37 P.3d 280 (2002). In this regard, the presumption of adequate representation is not overcome if there is any "conceivable legitimate tactic" that can explain counsel's performance. State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004).

As he admits on appeal, "one of Dempsey's primary defenses was that he lacked intent to rape J.M. because he was high on methamphetamine." Supp. Br. of Appellant at 1. Pursuant to the jury instructions given, the State had the burden of proving beyond a reasonable doubt that Dempsey acted with the intent to rape J.M. Defense counsel argued extensively in closing argument that the State had not met its burden of proof on this element.

> The State says, so what if Mr. Dempsey was using[?] Show me where in the jury instructions it says that being high on methamphetamines is a defense to this kind of crime.
> Well, it's a defense to this kind of crime because the State bears the burden of proving what was going on inside Mr. Dempsey's head at the time of this incident. And we all know, from the testimony that we heard from the witnesses, that a person on methamphetamines experiences certain symptoms that Mr. Dempsey was demonstrating at the time of his arrest in this case. And we all know, from Deputy Ostrum, that that includes hyper-vigilance and paranoia.
> And we know from [J.M.] that what Mr. Dempsey was saying to him doesn't make sense in the context of an attempt to rape the child. But does make sense in the context of somebody who's having some kind of paranoid moment at that moment in time.
> The bottom line is, it does affect what's going on inside someone's head. It is relevant to the question of what was going on inside Mr. Dempsey's head. And the State has to prove what was going on inside Mr. Dempsey's head at the time of this incident. And we don't know what was going on inside Mr. Dempsey's head. But we certainly have a reasonable explanation that fits more consistently with the evidence before you, than the State's effort to turn this into a sexual offense.
> And I want to point out—I don't want to suggest for you by providing an alternative explanation for what happened in the bathroom, that for some reason you should think "I have to do that." We don't have to do that. You know that the defense doesn't bear a burden of proof in the case. It's the State's burden of proof.

Defense counsel later returned to this theme:

> We don't have a burden of proof, but we do get the benefit of the evidence that comes in, even if it comes in through the State's witnesses.

It's a much more reasonable interpretation of what happened here. Mr. Dempsey was high. We don't know what was going through his mind. But what he was saying was he was going to kill this child.

Clearly [he was] not functioning properly. You listened to the description that the witnesses give of him later, he's staring off into space, not responding, not talking, "high as a kite" as Terrie Carlson described; whose brothers, three of them have addi[c]tion issues of their own including addiction to meth, so she knows something about it, intoxicated.

From Shawna Miller, who has worked as a substance abuse counselor and has training in that regard. In addition, Deputy Priebe-Olson saying that Mr. Dempsey seemed twitchy, agitated. Exact sort of symptoms that Deputy Ostrum said she would expect to see.

Bottom line is, we don't [know] what was going through Mr. Dempsey's mind on that day. But to say he had the intent to have sexual intercourse with a child is taking it too far. There just isn't evidence of that. There isn't.

The standard voluntary intoxication instruction given for the offense alleged herein would be:

No act committed by a person while in a state of voluntary intoxication is less criminal by reason of that condition. However, evidence of intoxication may be considered in determining whether the defendant acted with intent.

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 18.10, at 282 (3d ed. 2008); accord RCW 9A.16.090.

As the trial developed, Dempsey was able to argue to the jury that the State had not met its burden of proof based on his theory that his use of methamphetamine may have prevented him from forming the intent to rape—and that the State had not proved to the contrary. Had the pattern instruction on voluntary intoxication been given, the prosecution may have used that instruction against Dempsey by pointing out that—even if high on a drug—Dempsey's

-15-

conduct was still criminal and that there was no evidence in the case showing that methamphetamine prevented Dempsey from forming the intent to rape.

In short, it is conceivable that trial counsel considered all options and then chose to argue their case without putting the voluntary intoxication instruction before the jury. Because this tactical choice is conceivable, the presumption of adequate representation is not overcome. Dempsey's claim of ineffective assistance of counsel, therefore, fails.

Affirmed.

We concur: